**NEW ENGLAND MERCHANTS NATIONAL BANK, Plaintiff,**

v.

**IRAN POWER GENERATION AND TRANSMISSION COMPANY et al., Defendants.**

**No. 79 Civ. 6380 (KTD).***

United States District Court,
S. D. New York.

Sept. 26, 1980.

See also D.C., 495 F.Supp. 73.

---

\* Nos. 79 Civ. 6035 GLG, 79 Civ. 6115 WCC, 79 Civ. 6116 RJW, 79 Civ. 6117 TPG, 79 Civ. 6188 VLB, 79 Civ. 6195 LPG, 79 Civ. 6196 LPG, 79 Civ. 6276 PNL, 79 Civ. 6279 LPG, 79 Civ. 6312 HFW, 79 Civ. 6316 ADS, 79 Civ. 6331 TPG, 79 Civ. 6344 HFW, 79 Civ. 6362 HFW, 79 Civ. 6364 PNL, 79 Civ. 6369 LFM, 79 Civ. 6371 GLG, 79 Civ. 6376 HFW, 79 Civ. 6412 WCC, 79 Civ. 6413 CES, 79 Civ. 6414 CSH, 79 Civ. 6415 RWS, 79 Civ. 6416 CSH, 79 Civ. 6420 WCC, 79 Civ. 6429 CLB, 79 Civ. 6430 RO, 79 Civ. 6434 RJW, 79 Civ. 6440 LBS, 79 Civ. 6461 KTD, 79 Civ. 6467 HFW, 79 Civ. 6468 CBM, 79 Civ. 6470 LWP, 79 Civ. 6475 WK, 79 Civ. 6480 RJW, 79 Civ. 6483 HFW, 79 Civ. 6484 RWS, 79 Civ. 6485 RWS, 79 Civ. 6486 LWP, 79 Civ. 6488 GLG, 79 Civ. 6489 MEL, 79 Civ. 6493 EW, 79 Civ. 6497 RLC, 79 Civ. 6508 LPG, 79 Civ. 6512 LFM, 79 Civ. 6525 LPG, 79 Civ. 6587 TPG, 79 Civ. 6588 VLB, 79 Civ. 6606 WK, 79 Civ. 6620 CBM, 79 Civ. 6644 TPG, 79 Civ. 6693 GLG, 79 Civ. 6696 GLG, 79 Civ. 6709 JMC, 79 Civ. 6714 KTD, 79 Civ. 6748 LWP, 79 Civ. 6749 LWP, 79 Civ. 6810 MEL, 79 Civ. 6831 VLB, 79 Civ. 6835 WCC, 79 Civ. 6840 EW, 79 Civ. 6852 KTD, 79 Civ. 6860 CSH, 79 Civ. 6867 RWS, 79 Civ. 7035 CBM, 80 Civ. 0031 LWP, 80 Civ. 0033 WCC, 80 Civ. 0078 EW, 80 Civ. 0098 GLG, 80 Civ. 0233 LFM, 80 Civ. 0241 RWS, 80 Civ. 0406 RWS, 80 Civ. 0512 ADS, 80 Civ. 0560 WCC, 80 Civ. 0570 CES, 80 Civ. 0615 ADS, 80 Civ. 0791 PNL, 80 Civ. 0838 LWP, 80 Civ. 0933 EW, 80 Civ. 0989 HFW, 80 Civ. 1097 CLB, 80 Civ. 1099 LPG, 80 Civ. 1432 LBS, 80 Civ. 1520 CES, 80 Civ. 1679 VLB, 80 Civ. 1680 VLB, 80 Civ. 1681 VLB, 80 Civ. 1744 HFW, 80 Civ. 1897 RWS, 80 Civ. 1920 ADS, 80 Civ. 1953 LBS, 80 Civ. 1980 EW, 80 Civ. 2360 LWP, 80 Civ. 2570 WCC, 80 Civ. 3933 CBM and 80 Civ. 4932 EW.

## OPINION AND ORDER

KEVIN THOMAS DUFFY, District Judge:

These 96, ostensibly unrelated, civil actions were commenced by plaintiffs against the defendants, the Government of Iran, its agencies, instrumentalities and numerous other Iranian organizations "owned or controlled" by the Government of Iran (Plaintiffs' Joint Memorandum of Law at 1) to recover damages allegedly sustained as a result of defendants' breach or repudiation

of various commercial contracts and/or tortious conduct with respect thereto.[1]

I need not recount the longstanding political and commercial relationship which has existed between the United States and Iran. It is sufficient to say that over the years since World War II, the political ties between this country and Iran grew stronger. And, just as the political relationship strengthened, the commercial contacts between the countries also increased and flourished.

However, in the final days of 1978, the political situation in Iran became volatile. The Iranian Government, which had enjoyed a close relationship with the United States, was now under siege from within. Part and parcel of the attack upon the Iranian Government was an attack upon the United States' political and commercial interests in Iran.

The situation in Iran quickly deteriorated. The Government fell and a new regime assumed control. Once in power, the insurgents were quick to demonstrate their intention to put an end to the longstanding political and commercial contacts which had existed between the United States and Iran. In November, 1979, this situation reached the breaking point when a group of Iranians, with the apparent approval of the new regime, seized the American Embassy in Teheran, taking a number of American diplomatic and military personnel hostage. In addition, numerous commercial enterprises in which Americans held financial interests were apparently nationalized by the new regime.

In response to these political and diplomatic developments, the President issued the following executive order:

Pursuant to the authority vested in me as President by the Constitution and laws of the United States including the International Emergency Economic Powers Act, 50 U.S.C.A. § 1701 et seq., the National Emergencies Act, 50 U.S.C. § 1601 et seq., and 3 U.S.C. § 301,

I, Jimmy Carter, President of the United States, find that the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and hereby declare a national emergency to deal with that threat.

I hereby order blocked all property and interest in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran which are or become subject to the jurisdiction of the United States or which are in or come within the possession or control of persons subject to the jurisdiction of the United States.

The Secretary of the Treasury is authorized to employ all powers granted to me by the International Emergency Economic Powers Act to carry out the provisions of this order. This order is effective immediately and shall be transmitted to the Congress and published in the *Federal Register.*

Exec. Order No. 12170, 44 Fed.Reg. 65,729 (1979).

The Iranian situation did not improve. Finally, in April, 1980, the American Embassy and numerous citizens still in the hands of the Iranians with the continued support of those in control, the President severed all diplomatic ties with Iran and ordered all Iranian diplomats out of this country. To date, the situation remains basically unchanged. The President's executive order blocking all Iranian assets in this country is still in effect and the diplomatic ties with Iran remain severed. Additionally, the American Embassy, as well as its personnel, remains captive in Iran.

---

1. There are 96 individual complaints, each relying upon a separate cluster of operative facts which give rise to the several claims. The majority of claims seem to be grounded in contractual repudiation. However, many of the complaints seek relief for conversion as a result of the nationalization of various business ventures which, prior to the present political upheaval in Iran, were private commercial enterprises.

Despite the myriad of legal theories advanced, the essence of the claims is that the government of Iran, its agencies and instrumentalities, have expressed an unequivocal intention of avoiding their just debts.

In an effort to prevent the removal of Iranian assets from this jurisdiction, and to secure any subsequent judgments, plaintiffs have applied for, and were granted, orders of attachments pursuant to Article 62 of New York's Civil Practice Law and Rules, N.Y.Civ.Prac.Law §§ 6201 *et seq.* (McKinney 1980), made applicable to the instant actions *via* Fed.R.Civ.P. 64.[2] Plaintiffs now move to confirm these orders of attachments while defendants have cross–moved for the vacation thereof.[3]

Defendants oppose the confirmation of the instant attachments, and seek their vacation, on the ground that by virtue of the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602 *et seq.* [hereinafter referred to as the "FSIA" or the "Immunities Act"], their assets are immune from pre–judgment attachment.[4] Moreover, defendants urge that insofar as the Treaty of Amity, a trade agreement between the United States and Iran pre–dating the FSIA, is found to be controlling, it does not affect the immunity of Iran from pre–judgment attachment.

There is no question that the instant actions, bar none, are commercial in nature.

Indeed, plaintiffs seek monetary damages for alleged civil wrongs ranging from the nationalization and/or conversion of personal property in Iran to the repudiation and breach of various and sundry executory contracts. However, the political situation in Iran, as well as the strained political and diplomatic relations between the United States and Iran, has in large part triggered the commencement of these actions. Thus, while these actions are purely commercial in nature, the political and economic implications of the Iranian situation cannot be totally divorced therefrom.

This is a court of law before which all parties stand equal. I preside over these actions not as a patriot, but rather as a judicial officer, sworn to faithfully and impartially discharge all the duties incumbent upon me as a United States District Judge. However, my oath of office does not require that I decide legal issues in a vacuum nor in an ivory tower removed from the clamor of reality. Such is the task of legal scholars. Instead, I must resolve issues in the context of the real world. Mindful of these basic principles, I turn to consider the legal questions at hand.

2. Rule 64 provides:
   At the commencement of and during the course of an action, all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held, existing at the time the remedy is sought,

   .    .    .    .    .

   The remedies thus available include arrest, attachment, garnishment, replevin, sequestration, and other corresponding or equivalent remedies, however designated and regardless of whether by state procedure the remedy is ancillary to an action or must be obtained by an independent action.

3. The majority of attachments were granted at a time when any communication between Iran and the United States was virtually impossible and prior to the retention of counsel by the various Iranian defendants. Consequently, many of the orders of attachment were issued *ex parte*. However, counsel was soon retained by defendants and subsequent orders of attachment were issued only upon notice to defendants.

Procedurally, New York's attachment statute distinguishes between *ex parte* orders of attachment and those issued on notice. With respect to the *ex parte* orders, the party seeking the order must move to confirm the attachment within five (5) days. § 6211(b). However, when the order is issued upon notice, the initial burden is upon defendant to move to vacate the attachment. § 6223(a).
These procedural distinctions account for the instant motions and cross–motions.

4. As is evident from the discussion thus far, the instant actions have been consolidated before me for the limited purpose of determining whether the Immunities Act immunizes defendants' assets from a pre–judgment security attachment. The issue of jurisdictional immunity, if it is to be asserted, is not an issue which is before me and accordingly I make no finding with respect thereto. I merely note that none of the parties have urged that the instant attachments act as a jurisdictional predicate. Rather, plaintiffs rely upon 28 U.S.C. §§ 1330(a) and 1331 as the basis of subject matter jurisdiction over the instant disputes and 28 U.S.C. § 1330(b) as the basis of personal jurisdiction over the defendants.

The question before the Court at this juncture is relatively simple: whether the State of Iran, its agencies and instrumentalities, are entitled to immunity from pre-judgment attachment. However, its resolution is somewhat more complex.

Traditionally, the grant of immunity to a foreign sovereign was a question for the executive or the legislature or some arm of government sensitive to political considerations. In this country, however, steeped in expectations of even-handed, apolitical justice from its "Third Branch", Congress by the passage of the Foreign Sovereign Immunities Act has vested in the judiciary the authority to determine the method, extent, and beneficiaries of such immunity. This grant of power to the judiciary was properly circumscribed by the statutes passed by Congress and signed and approved by the President.

The 1976 codification of the doctrine of foreign sovereign immunity in this country is found in the Immunities Act. 28 U.S.C. §§ 1602 *et seq.* In doing so, Congress intended to work a significant change in how the claim of sovereign immunity was handled. Prior to the FSIA, the traditional practice was that, when faced with a claim of sovereign immunity, a court would defer consideration of the claim until the State Department had stated its position. This was done because it was believed that the question of whether a sovereign was entitled to immunity was essentially a political, rather than a judicial determination. Consequently, as it developed, the State Department's "position" was viewed as quite persuasive by the courts and would often carry the day.

An argument may well be made that the adoption of the Foreign Sovereign Immunities Act was prompted by economic consid-

erations. I do not doubt that Congress was aware that our national economy had become interdependent with the world economy and that of specific foreign nations which are or may become our trading partners. But economic considerations did not bring about the specific format of the Act. Other things subtly and not so subtly influenced the making of the Act. I need not dwell on the reasons behind this action since it is clear that courts are now directed to reach their own independent determination of the claim of immunity "in conformity with the principles set forth in the [Immunities Act]." 28 U.S.C. § 1602. Thus, not only does the responsibility of determining a claim of sovereign immunity reside exclusively with the judiciary, but now there is a uniform standard against which the claim of immunity is to be tested. This, of course, adds a dimension of predictability to the doctrine of sovereign immunity which had been absent when the determination was made, at least preliminarily, by the State Department.

The FSIA speaks to four separate immunities enjoyed by a foreign state, its agencies and instrumentalities: jurisdictional immunity; immunity from pre-judgment attachment; immunity from post-judgment attachment; and immunity from execution upon a judgment.

Although each of these immunities will necessarily have to be addressed in the disposition of these actions, at this juncture I need only resolve the limited question of whether the foreign state of Iran has waived, or is otherwise not entitled to, immunity from pre-judgment attachment. To be sure, each of the other immunities involves questions of fact and law which are not common to each of the defendants and must be left to a case by case analysis.[5]

---

5. For example, some, but not all, of the defendants have asserted the "act of state" doctrine as an absolute defense to their actions in connection with the various commercial activities in issue. In addition, many of the bank defendants have asserted that the funds which are the subject of the *instant suits constitute funds* held for the bank's own account and are thus immune from attachment and execution. It is

enough to note that these defenses, however meritorious, must be dealt with on a case by case basis by the individual judge to whom they are assigned.

Although I need not decide the merits of the several uncommon defenses asserted by the defendants, I feel I must comment on at least one of these defenses. At the joint confirmation hearing held in this matter, the Bank Mar-

However, a quick review of these immunities will prove helpful on the issue of pre–judgment attachment.

The FSIA generally continues the jurisdictional immunity granted to foreign states, subject only to a few well–defined and carefully delineated exceptions. The most pertinent exception of jurisdictional immunity with respect to the instant suits obtains when an action is based upon commercial activity conducted by the foreign state. 28 U.S.C. § 1605. And, while I need not decide the issue at this juncture, there can be little doubt that the vast majority of the claims asserted by plaintiffs emanate from the commercial activity of the Iranian defendants rather than from any political conduct or so called "acts of state."

With respect to pre–judgment attachment, the Immunities Act provides that the assets of a foreign state, its agencies and, instrumentalities, are immune from such attachment unless it has explicitly waived its immunity and the purpose of the attachment is to secure a judgment which may be entered. 28 U.S.C. § 1610(d).

Similarly, immunity from post–judgment attachment and execution of judgment exists except where the foreign state has waived such immunity. Here, however, unlike prejudgment attachment, the Immunities Act provides that the waiver may be made either *explicitly or implicitly* by the foreign state. 28 U.S.C. § 1610(a), (b).

As I noted above, the Immunities Act is a relatively new piece of legislation. It was not, however, enacted in a vacuum. On the contrary, Congress was aware that numerous trade and friendship agreements had been executed by the United States and various foreign states prior to the passage of the Immunities Act. Moreover, Congress was acutely aware that these treaties often

addressed the issue of sovereign immunity and included limited waivers thereof. Consequently, the Immunities Act expressly provided that all existing international agreements to which the United States is a party would survive the FSIA. That is to say, insofar as a foreign state had previously waived its sovereign immunity from jurisdiction, attachment or execution of judgment, by agreement with the United States, these waivers still control on the question of immunity. There is just such a treaty which exists between the United States and Iran.

In 1955, the Treaty of Amity was executed by the United States and the Government of Iran.[6] The Treaty, insofar as it waives sovereign immunity, provides that:

> No enterprise of either [the United States or Iran], including corporations, associations, and government agencies and instrumentalities, which is publicly owned or controlled shall, if it engages in commercial, industrial, shipping or other business activities within the territories of the other High Contracting Party, claim or enjoy, either for itself or for its property, immunity therein from taxation, suit, execution of judgment or other liability to which privately owned and controlled enterprises are subject therein.

Treaty of Amity, Aug. 15, 1955, United States–Iran, Art. XI ¶ 4, 8 U.S.T. 901, 909, T.I.A.S. No. 3853.

It is quite apparent from all that has been stated, the threshold question is whether the State of Iran has waived its immunity from pre–judgment attachment under either the provisions of the Immunities Act or the Treaty of Amity. This, of course, is an issue which has recently been addressed by this and other courts. *See, e.*

---

kazi engaged in substantial argument in an effort to establish itself as the Central Bank of Iran.

From what was said at argument, it is clear that the question has been put in issue but it is far from settled. It would appear to me that the Bank has the burden of proof in this regard and that it must produce much more to sustain that burden.

**6.** Despite the numerous arguments advanced by the parties, as well as the voluminous papers submitted with respect to the instant motions, no one has urged that the Treaty of Amity is no longer in effect. And, although some are quick to point to Iran's apparent violation thereof, there has been no indication by the Executive Branch that it considers the Treaty of Amity at an end.

*g., American International Group, Inc. v. Islamic Republic of Iran*, 493 F.Supp. 522 (D.D.C.1980); *E–Systems, Inc. v. Islamic Republic of Iran*, 491 F.Supp. 1294 (N.D. Tex.1980); *Reading & Bates Corp. v. National Iranian Oil Co.*, 478 F.Supp. 724 (S.D. N.Y.1979); *Behring International v. Imperial Iranian Air Force*, 475 F.Supp. 383 (D.N. J.1979).

Additionally, there is the question of what effect, if any, do the President's actions in dealing with the Iranian situation have upon that foreign state's entitlement to immunity from pre–judgment attachment.

I turn initially to the Immunities Act and the waiver of pre–judgment attachment provision contained therein. As previously noted, the Immunities Act provides that a foreign state is entitled to immunity from pre–judgment attachment unless both of the following conditions are met:

> (1) the foreign state has explicitly waived its immunity from attachment prior to judgment, and

> (2) the purpose of the attachment is to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction.

The parties concede, as they must, that the only possible waiver of pre–judgment attachment by the State of Iran is contained in the Treaty of Amity. However, the Treaty's waiver provision does not expressly address immunity from pre–judgment attachment. Rather, it waives Iran's immunity from "taxation, suit, execution of judgment or other liability to which privately owned and controlled enterprises are subject [to]."

■ The Treaty of Amity does not constitute an explicit waiver of pre–judgment attachment. *Reading & Bates, supra; Behring International, supra. See also E–Systems, Inc., supra*, at 1302. The language of the Immunities Act could not be any clearer. It requires an unequivocal waiver of pre–judgment attachment. In contrast, with respect to the waiver of post–judgment attachment as well as execution upon a judgment, the FSIA permits the waiver to be either express or implied. Thus, it was not the result of Congressional inadvertence that the waiver of pre–judgment attachment be express. Congress recognized that pre–judgment attachment is an extraordinary and harsh remedy not to be lightly waived. Instead, only the clearest of waivers will subject a foreign state to this extraordinary remedy.

The question remains whether the Treaty of Amity, which, under the terms of the Immunities Act, survives as a viable international agreement, implicitly waives pre-judgment attachment. With respect to this issue, there has been some disagreement. *Compare, American International Group, supra, and Behring International, supra, with E–Systems, Inc., supra, and Reading & Bates, supra.*

In *Behring*, the court found that the waiver provision in the Treaty of Amity did not constitute an explicit waiver of pre–judgment attachment under the Immunities Act. However, the court went on to find that the waiver provision contained in the Treaty did constitute an implicit waiver of pre–judgment attachment. The court reasoned that since the FSIA was subject to the terms of the Treaty, the Treaty's waiver provision was to be governed by ordinary principles of construction rather than by reference to the stringent waiver requirement set forth in the Immunities Act. I respectfully disagree and must adhere to my original determination of this issue in *Reading & Bates*, albeit *in dicta*, that a waiver of pre–judgment attachment, whether by statute or by international agreement, must be explicit.

There is no question that Congress carefully chose its words in the FSIA by providing that only an explicit waiver of pre–judgment attachment was sufficient. And rightfully so. As I have already stated, pre–judgment attachment is an extraordinary remedy not to be lightly granted. Indeed, pre–judgment attachment, as with the other provisional remedies, is unique in that it affords plaintiff a substantial meas-

ure of relief absent a final determination that plaintiff is entitled to any relief whatsoever. Moreover, the provisional remedies are too potentially harassing to be freely granted. For these reasons, the courts have long adopted the view that "owing to the statutory origin and harsh nature of [these remedies]," they are to be construed "in accordance with the general rule applicable to statutes in derogation of the common law, strictly in favor of those against whom [they] may be employed." *Penoyar v. Kelsey,* 150 N.Y. 77, 79–80, 44 N.E. 788, 789 (1896).

■ Furthermore, even when the question is a matter of contractual, rather than statutory interpretation, it is well–settled that "[t]he consent necessary to waive [a] traditional immunity must be express, and it must be strictly construed." *United States v. New York Rayon Importing Co.,* 329 U.S. 654, 659, 67 S.Ct. 601, 603, 91 L.Ed. 577 (1947). Thus, application of merely the "ordinary principles of construction" is inappropriate when the construction of a waiver of sovereign immunity is at stake. *Id. See also Hurley v. United States,* 624 F.2d 93 (10th Cir. 1980).

Applying these principles of construction to the Treaty in issue, I am unable to conclude that a waiver of prejudgment attachment was contemplated. To be sure, the waiver of immunity from "other liability to which privately owned and controlled enterprises are subject" is not sufficiently explicit, under the rigors of strict construction, to include the extraordinary provisional remedy of pre–judgment attachment.

■ Finally, the rigors of strict construction aside, it is elemental contract law that when a court attempts to construe the meaning of a written agreement, the intention of the contracting parties must be given effect. And, it is their intention as it existed at the time the contract was executed which must control rather than any subsequent intention tailored to complement an individual's posture once an agreement has gone sour.

As I indicated in *Reading & Bates,* whatever "other liability" might include, it could not have been the intention of either the United States or Iran that immunity from pre–judgment attachment was to be waived. It would indeed be anomalous for a sovereign nation, in entering a treaty calculated to promote commerce, to suggest at the same time that it would attempt to evade a lawful judgment arising out of its commercial activities. And, despite the allegation that it is Iran's present commitment to avoid these debts, it is Iran's intention when executing the Treaty of Amity which must control.

■ In sum, when tested against the rigors of strict construction and in light of the extraordinary nature of pre-judgment attachment as well as the likely intention of the parties to the Treaty of Amity, the language of the Treaty is not sufficient to authorize the pre–judgment attachment of Iranian assets.

This, however, does not fully dispose of the issues before me. The question remains whether any of the extraordinary actions taken by the Chief Executive in response to the Iranian situation affect that country's enjoyment of the privilege of sovereign immunity.

In December, 1977, Congress passed the International Emergency Economic Powers Act. 50 U.S.C. §§ 1701 *et seq.* [hereinafter referred to as the "Emergency Powers Act"]. The purpose of the Act was "to revise and delimit the President's authority to regulate international economic transactions during wars or national emergencies." [1977] U.S. Code Cong. & Ad. News, pp. 4540, 4541. The Emergency Powers Act provides that when this country is faced "with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States," the President may declare a national emergency with respect to such threat. 50 U.S.C. § 1701.

The Act further provides that when the President declares such a national emergency, he may:

(A) investigate, regulate, or prohibit–

(i) any transactions in foreign exchange,

(ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

(iii) the importing or exporting of currency or securities; and

(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest;

by any person, or with respect to any property, subject to the jurisdiction of the United States.

50 U.S.C. § 1702.

Finally, the Act requires that upon exercising the broad powers granted him under the Emergency Powers Act, the President must submit periodic reports to Congress apprising it of the situation and whether the declaration of a national emergency must continue. 50 U.S.C. § 1703.

On November 14, 1979, President Carter, by issuing Executive Order 12179, became the first President to exercise the sweeping authority granted under Emergency Powers Act. The Chief Executive concluded that the present situation in Iran created "an unusual and extraordinary threat to the national security, foreign policy and economy of the United States" and thus constituted a national emergency. In his Executive Order the President "order[ed] blocked, all property and interest in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran which are or become subject to the jurisdiction of the United States...." Exec.Order No. 12170, 44 Fed. Reg. 65,729 (1979).

In his first report to Congress, dated April 7, 1980, the President declared that:

1. On November 14, 1979, I took the step of blocking certain property or interests in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran. At that time the United States Embassy in Teheran was occupied and American personnel were being held hostage there in flagrant violation of international law. *In addition, Iran had threatened suddenly to withdraw its assets from United States banks, to refuse to accept payment in dollars for oil, and to repudiate obligations owed to the United States and to United States nationals. Iran's action attacked the foundations of the international legal order as well as the stability of the world economy and the international monetary system.*

2. The extraordinary threat to the national security, foreign policy, and economy of the United States, which I determined existed on November 14, continues today. The United States has used every diplomatic and legal means available to it to end this extraordinary threat, but without avail. Iran has ignored or rebuffed a decision by the International Court of Justice, resolutions by the Security Council of the United Nations and efforts by the Secretary General of the United Nations and others to resolve the underlying problems.

(emphasis added).

Thereafter, in a subsequent report to Congress, dated April 17, 1980, the Chief Executive reaffirmed the existence of a national emergency:

1. The circumstances necessitating the exercise of this authority are the continuing events in Iran, including the actions and omissions of the Government of Iran in violation of its obligations under international law, which caused me to declare a national emergency on November 14, 1979, and to take the action set forth in Executive Order No. 12170 of November 14, 1979, and Executive Order No. 12205 of April 7, 1980, and the additional unusual and extraordinary threat to the na-

tional security, foreign policy and economy of the United States created by events subsequent to November 14, 1979, in Iran and neighboring countries, including the Soviet invasion of Afghanistan.

2. The events in Iran and neighboring countries threaten the strategic and vital interests of the United States. The occupation of the United States Embassy in Teheran and the taking and holding of American citizens hostage there and the Soviet occupation of Afghanistan are flagrant violations of the international order upon which the security of all nations and international peace are based. Such actions in a region of such vital importance to the United States, and most of the world, constitute a grave threat to the national security, foreign policy and economy of the United States.

It is evident from the terms of the Emergency Powers Act that Congress intended to afford the President great latitude in protecting the political and economic integrity of the United States from exterior forces. Indeed, Congress went so far as to make the President's declaration of a national emergency under the Emergency Powers Act a final and nonreviewable determination. Thus, while a Presidential declaration of a national emergency is generally subject to termination or dissolution by way of Congressional resolution, National Emergencies Act, 50 U.S.C. §§ 1601 *et seq.*, the Emergency Powers Act expressly insulates a Presidential declaration made thereunder from collateral attack. It is against these broad Presidential powers that Iran's entitlement to sovereign immunity must be tested.

■ Sovereign immunity is granted to foreign governments as a matter of comity. While it is a well–established doctrine, it is clear that it is a privilege granted by one sovereign to another in the family of nations. It is not now nor has it ever been a right enjoyed by one sovereign within the territorial jurisdiction of another. *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812). *See also Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); *Guaranty Trust Co. v. United States*, 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224 (1938). The fact that the doctrine has now been codified in the Immunities Act does not alter this fundamental premise. To be sure, sovereign immunity is a privilege enjoyed by a foreign nation rather than an inalienable right to which it can lay claim.

■ Sovereign immunity, at the bare minimum, means that the sovereign may do with its own property as it wishes. To deny this basic privilege is to deny the concept of sovereign immunity. Yet, the President's order of November 14, 1979, did just that. In reviewing the President's order blocking all Iranian assets, as well as the legislative history of the Emergency Powers Act upon which the order relies, there can be no question that whatever immunity from pre–judgment attachment existed prior to November 14, 1979, was unequivocally suspended by the President. The Emergency Powers Act expressly provides that upon the declaration of a national emergency the President may "nullify, void, prevent, or prohibit ... [the exercise of] any right, power, or privilege with respect to ... any property in which any foreign country or a national thereof has any interest." 50 U.S.C. § 1702(a)(1)(B). Neither the language of the Act nor the legislative history could be any clearer.

In addition, in his April 7th report to Congress, the President specifically found that Iran had threatened "to repudiate obligations owed to the United States and to United States nationals." The economic ramifications of these repudiations posed a sufficient threat to the integrity of our economic system that the Chief Executive invoked the provisions of the Emergency Powers Act. It would truly be anomalous to find now that despite the President's expressed concern with respect to the just debts of Iran, and the profound effect the repudiation thereof would have upon our economy, the privilege of immunity from pre–judgment attachment survives.

Finally, both the Treaty of Amity and the FSIA predate the Emergency Powers Act.

Since neither the Treaty nor the Immunities Act expressly waived Iran's immunity from pre-judgment attachment, I must conclude that Congress was well aware that this immunity survived. And yet, in structuring the Emergency Powers Act, Congress used the most expansive language in conferring powers upon the President with respect to dealing with the assets of foreign nations. Indeed, the Emergency Powers Act permits the President to nullify and void any rights or privileges a foreign nation may have with respect to assets within the United States. Thus, there can be no doubt that by enacting the Emergency Powers Act, Congress intended to permit the President to nullify and void or suspend a sovereign's immunity from pre–judgment attachment. This is precisely what the President has done with respect to the Iranian assets within the United States. Thus, for as long as the President's order is in effect, the sovereign immunity normally granted to Iran is suspended at least insofar as "all property and interest in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran which are or become subject to the jurisdiction of the United States . . ." Exec. Order No. 12170, 44 Fed.Reg. 65,729 (1979).

In their opposition to the instant motions to confirm, and in support of their motions to vacate, defendants rely heavily upon the fact that neither the Presidential Order freezing Iranian assets within the United States nor the Treasury Regulations promulgated thereunder, mention the Immunities Act, the Treaty of Amity or sovereign immunity. They reason that absent such specific reference, Iran's entitlement to immunity from pre–judgment attachment remains fully intact. *See E–Systems, Inc., supra,* at 1302–1303.

The pertinent Treasury Regulations promulgated as a result of the President's Order freezing Iranian assets provide:

(a) Subject to the limitations of paragraphs (b) and (c) of this section, judicial proceedings are authorized with respect to property in which on or since the effective date there has existed an interest of Iran or an Iranian entity.

(b) This section does not authorize or license:

(1) The entry of any judgment or of any decree or order of similar or analogous effect upon any judgment book, minute book, journal or otherwise or the docketing of any judgment in any docket book, or the filing of any judgment roll or the taking of any other similar or analogous action.

(2) Any payment or delivery out of a blocked account based upon a judicial proceeding, nor does it authorize the enforcement or carrying out of any judgment or decree or order of similar or analogous effect with regard to any property in which Iran or any Iranian entity has an interest.

(c) A judicial proceeding is not authorized by this section if it is based on transactions which violated the prohibitions of this part.

44 Fed.Reg. 67617 (1979).

Thereafter, the Treasury Department issued the following regulation:

The general authorization for judicial proceedings contained in § 535.504(a) includes pre–judgment attachment. However, § 535.504(a) does not authorize payment or delivery of any blocked property to any court, marshal, sheriff, or similar entity, and any such transfer of blocked property is prohibited without a specific license. It would not be consistent with licensing policy to issue such a license.

44 Fed.Reg. 75353.

In *E–Systems, Inc.,* the court assumed, without deciding, that the Treasury Regulations could displace the grant of immunity from pre–judgment attachment under the FSIA since these regulations were the "result of the President having delegated his sweeping powers under the [Emergency Powers Act]." At 1302 n.14. The court, however, found that "[i]f the Treasury Department wish[ed] to abrogate the existing law of prejudgment attachment of assets of foreign countries as to Iran and its entities, it could do so in a clearer fashion." *Id.* at

1303. The court concluded that since the Treasury Department's authority was not without question, an express abrogation was necessary. *Id.*

Although the court's reasoning in *E–Systems, Inc.* is not without some appeal, I must respectfully disagree with it. The Treasury Regulations are not to be read alone. On the contrary, they must be read in conjunction with the President's Order invoking the broad powers granted him under the Emergency Powers Act as well as his subsequent reports to Congress. When this is done, there can be no doubt that the President intended, and the regulations expressly permit, that Iranian assets in the United States are no longer entitled to the privilege of immunity and, thus, are subject to pre-judgment attachment.

Defendants also urge that the following Treasury Regulation clearly refutes plaintiffs' entitlement to pre-judgment attachment:

> Any regulation, ruling, instruction or license authorizing a transaction otherwise prohibited under this part has the effect of removing a prohibition or prohibitions in Subpart B from the transaction, but only to the extent specifically stated by its terms. Unless the regulation, ruling, instruction or license otherwise specifies, *such an authorization does not create any right, duty, obligation, claim, or interest in, or with respect to, any property which would not otherwise exist under ordinary principles of law.*

44 Fed.Reg. 75353–4 (emphasis added). They argue that since under "ordinary principles of law" Iranian assets are immune from pre-judgment attachment, the regulations were not intended to authorize such attachments.

It is evident that the President by invoking the authority of the Emergency Powers Act intended to prohibit the State of Iran, its agencies and instrumentalities, from enjoying any rights and privileges with respect to their assets which are subject to the jurisdiction of the United States. The President blocked all Iranian assets and denied exercise of the most basic incidents of ownership and of sovereignty. He further directed the Secretary of the Treasury to issue regulations "to carry out the provisions of [the Executive] order."

█ It is well-settled that in order to be valid, a regulation must be consistent with the statute under which it is promulgated. *U. S. v. Larionoff,* 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); *Ernst and Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Thus, a regulation cannot abrogate the clear intent of the statute which gave it life. *See Vitco, Inc. v. Government of the Virgin Islands,* 560 F.2d 180, 184 (3d Cir. 1977), *cert. denied,* 435 U.S. 980, 98 S.Ct. 1630, 56 L.Ed.2d 72 (1978). These principles apply with equal force to an Executive Order which authorizes the promulgation of regulations to carry out its provisions.

If I were to adopt defendants' interpretation of the quoted regulation, however, it would be in clear conflict with the intention of the Chief Executive in issuing the order freezing Iranian assets. Indeed, paramount in the President's decision to freeze the Iranian assets was his determination that absent the order, Iran would withdraw all its assets from this country and thereby avoid its just debts. The profound detrimental effect this would have on our economy was apparent to the President and for this reason the Iranian assets were frozen. It would truly be inconsistent if the regulation were now construed in such a way as to continue Iran's immunity from pre-judgment attachment.

In any event, the plain language of the regulation, when read in conjunction with the President's freezing order and subsequent reports to Congress, negates any possibility that the privilege of immunity from pre-judgment attachment was to be continued with respect to Iranian assets. It is true that the language quoted was intended to insure that no interest in Iranian assets would accrue to an individual simply by virtue of the Treasury Regulations. Instead, an individual's claim must be grounded in "ordinary principles of law." That is to say, the Treasury Regulations were not

intended to create any substantive rights with respect to the blocked assets. However, the clear import of the Executive Order, as well as the President's subsequent reports to Congress, was to dissolve Iran's privilege of immunity from pre-judgment attachment. And, when stripped of the regulation authorizing pre-judgment attachment, the defendants are left with the Executive Order's termination or suspension of Iran's privilege of immunity.

Furthermore, the quoted regulation, concededly composed in haste, contemplates that an individual's entitlement to pre-judgment attachment with respect to a particular claim must be tested under state law. If under state law there exists a substantive basis for such an attachment, the regulations simply permit such proceedings.

In short, defendants have confused the substantive basis for an attachment under state law and the defense of sovereign immunity. While the President's order, and subsequent Treasury Regulations, have in no uncertain terms set aside the defense of the privilege of sovereign immunity, the regulations do not themselves provide a substantive basis for the attachments. For this, the plaintiffs must look to New York law and meet the requirements as set forth in the attachment statute.

Before turning to the requirements of state law, I must dispose of one last neat question of purely federal jurisprudence. I have discussed at length the problems raised by the Foreign Sovereign Immunities Act for two most compelling reasons. First, unless one can see and consider the full scope of the Immunities Act, the grave import of this extraordinary situation will not be fully understood. Second, it should be clear that, absent Executive Order 12170 or prior to it, no valid levy of a pre-judgment attachment could lie. Thus, in those situations where an attempted levy was made prior to November 14, 1979, the date of the Executive Order, the attempted pre-judgment attachment was to property then immune and thus of no effect. In those situations, if the levy is now properly made,

pre-judgment attachment may lie. Of course, resort still must be had to the requisites of state law in determining the validity of such attachments.

Under New York's attachment statute, in order to confirm an attachment, and similarly, to withstand a motion to vacate, the plaintiff bears the burden of establishing that the attachment is based upon proper grounds, there is a need for continuing the levy and that there is a probability that plaintiff will succeed on the merits of the underlying claim. N.Y.Civ.Prac.Law §§ 6211(b), 6223(b) (McKinney 1980).

Turning first to the proper grounds for an attachment, the New York statute provides in relevant part:

An order of attachment may be granted in any action, except a matrimonial action, where the plaintiff has demanded and would be entitled, in whole or in part, or in the alternative, to a money judgment against one or more defendants, when:

1. the defendant is a non-domiciliary residing without the state, or is a foreign corporation not qualified to do business in the state; or

. . . . .

3. the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts;

Each of the complaints filed, without exception, seeks monetary damages. As previously mentioned, these actions, although triggered by a dynamic political situation, are truly commercial in nature.

In addition, the defendants are non-domiciliaries including many foreign corporations not qualified to do business in this state. Moreover, the President has declared that Iran's threat to remove all its assets from this country, and thereby avoid its just debts, was sufficiently serious to warrant the freezing of all Iranian assets. I find the President's determination to be

most persuasive in this regard. Indeed, if Iran's threat was serious enough to trigger the blocking of all Iranian assets in this country without reference to any specific debt, then certainly when the specific debts are enunciated, individual orders of attachment are warranted.

Turning to the continued need for the levy, the instant actions present an interesting situation. The President has frozen all Iranian assets in this country. And under the regulations issued by the Treasury Department, individual litigants are not permitted to obtain by levy any Iranian assets. However, if the Presidential freeze order is dissolved, the need for the levy is apparent. Moreover, while the President's order effectively blocks all Iranian assets, it does so without reference to the individual claims of the plaintiffs herein. Thus, while plaintiffs' claims are objectively secure, the individual levies are necessary to secure plaintiffs' judgments and establish a priority vis–a–vis the individual claims, should the President's freezing order be lifted.

█ The final requirement is that plaintiff demonstrate a likelihood of success on the merits. In one respect, plaintiffs have already done so. As I found above, the state of Iran, its agencies and instrumentalities, are not entitled to assert the privilege of sovereign immunity from pre–judgment attachment. However, the plaintiffs must still demonstrate that the individual claims upon which they rely have merit. That is to say, they must demonstrate a *prima facie* case with respect to their claims of breach of contract, repudiation, nationalization and conversion. This requires a case by case analysis and clearly involves questions of fact and law peculiar to each individual case. Thus, this determination must be referred to the individual judges to whom these actions have been assigned.[7]

I have received *in camera* "Suggestions of Interest of the United States of America" including submissions from the Secretary of Treasury and the Deputy Secretary of State. Their concern, *inter alia*, was understandable since the Foreign Sovereign Immunities Act covers all foreign nations and the terms of the Treaty of Amity between Iran and the United States are found *in haec verba* in such treaties between this country and at least nine other nations. I have the utmost respect for the views of these officials but I believe their concern in this regard is misplaced. My interpretation of both the Immunities Act and the Treaty of Amity is no more than that traditionally held. In recognizing the reality of the actions of the President, I am merely recognizing reality and applying the logic of law. From an international relations point of view nothing has changed–only that the rights of the plaintiffs in these actions have been recognized.

█ The government of the United States has also requested an indefinite stay in all of these cases. In large measure, this request is based on foreign policy considerations.[8] I must balance this request and the fact that the management of foreign affairs is the exclusive prerogative of the President with the duties imposed on my office by the Constitution to fairly and justly decide issues brought before this Court. While I acknowledge the difficulties of the Presidency in handling foreign policy in this potentially dangerous situation, I am sure that a fair reading of this Opinion will convince the world that the resolution of the issues before me does not, in any way, impinge on the enormous prerogatives vested in the President. Indeed, I believe that the reasoned determination of the problems

---

7. I also note for the record that at least one of the actions before me involves an arbitration provision. *See Reading & Bates v. National Iranian Oil Co.*, No. 79–6035. However, despite the fact that a virtually identical arbitration provision has been found to constitute a waiver of sovereign immunity, *Ipitrade International v. Federal Republic of Nigeria*, 465 F.Supp. 824 (D.D.C.1978), plaintiffs' counsel, when questioned on the point, declined to pursue arbitration. *See also Reading & Bates, supra*, 478 F.Supp. at 726.

I raise this point insofar as it may prove fruitful in the case by case treatment which must necessarily follow.

8. The other argument raised by the government in this connection is totally devoid of any merit.

presented to me will, if anything, clarify the issues which may become involved in the overall foreign policy of this nation and help others to more fully realize that this nation is founded on law and legal principles.

Accordingly, the request of the United States for an indefinite stay in these proceedings is denied.

The statements submitted by the Secretary of Treasury and the Deputy Secretary of State are to be sealed and left under seal until further order.

For the foregoing reasons, the instant attachments should be confirmed and the defendants' motions to vacate denied upon a final determination, on a case by case basis, with respect to the plaintiffs' likelihood of success on the merits. Upon these individual determinations, the appropriate orders of confirmation will enter.