UNIDYNE CORPORATION, Plaintiff,

v.

GOVERNMENT OF IRAN (ISLAMIC REPUBLIC OF IRAN), acting By and Through the IMPERIAL IRANIAN NAVY (NAVY OF the ISLAMIC REPUBLIC OF IRAN), et al., Defendants.

Civ. A. No. 80–1029–A.

United States District Court,
E. D. Virginia,
Alexandria Division.

March 30, 1981.

---

John F. Mardula, Lewis, Mitchell & Moore, Vienna, Va., for plaintiff.

George P. Williams, Asst. U. S. Atty., Alexandria, Va., for United States.

## MEMORANDUM OPINION

ALBERT V. BRYAN, Jr., District Judge.

Plaintiff Unidyne Corporation, a Virginia corporation with its principal place of business in the State of Virginia, entered into a contract with the Imperial Iranian Navy (now the Navy of the Islamic Republic of Iran) in 1977 to provide training and maintenance analysis for equipment of the Iranian Navy. Unidyne alleges that because of internal political conditions in Iran subsequent to the contract, it was unable to complete its contract and that it has incurred expenses and losses in excess of One Million Five Hundred Sixty Thousand Six Hundred Forty-Two and 60/100 Dollars ($1,560,642.60) which defendant, the Government of Iran, has failed and refused to pay. Unidyne seeks a judgment in this court for the alleged deficiency.

Jurisdiction is asserted under Article III, Section 2 of the Constitution; the Treaty of Amity, Economic Relations and Consular Rights between the United States and Iran, August 14, 1955 (1957), 8 U.S.T. 899, T.I. A.S. 3853; and 28 U.S.C. § 1330, § 1332 and § 1602 et seq.

On or about December 29, 1980, Unidyne requested, and the clerk of this court executed, prejudgment attachments against some twenty-seven (27) American corporations as joint defendants, pursuant to Va. Code § 8.01–533 et seq., and Fed.R.Civ.P. 64, alleging that the American defendants hold funds or property belonging to the principal defendant, Iran, which could satisfy Iran's debt to Unidyne. Most of the American defendants have answered that they hold no funds or property belonging to Iran. Plaintiff claims that all of the co-defendants had business dealings with Iran and that the practice of the Iranian government in most of its contractual dealings was for the Iranian government to forward a down payment of up to twenty per cent of the contract which is legally the property of Iran until an appropriate court rules upon the validity of any claims and offsets claimed by co-defendants. Unidyne has in fact sued out a supplemental writ of attachment against itself on this theory and answered that it holds $160,412.40 in unliquidated down payment monies from the Government of Iran.

On February 10, 1981, the United States filed in this court a Statement of Interest requesting a stay in the proceedings here to allow President Reagan to complete a review of the executive orders issued January 19, 1981 by President Carter transferring and otherwise disposing of Iranian assets in the United States as a part of the agreement between the United States and Iran which resulted in the release of American hostages held in Iran. Proceedings were stayed by order of this court until March 6, 1981, subject to certain exceptions.[1]

On February 12 Unidyne filed a motion to "Compel Examination of the Co-Defendants" in connection with the writs of attachment.

On February 24, 1981 President Reagan issued Executive Order No. 12294 which ratified Executive Order Nos. 12276–12285 issued by President Carter on January 19, 1981, and ordered: "All claims which may be presented to the Iran-United States Claims Tribunal under the Terms of Article

---

1. "1. The Plaintiff may be allowed to perfect any service of process or Writs of Attachment currently outstanding.

2. The time for the principal defendant to file responsive pleadings to the Complaint is not extended by this stay; however, this provision does not preclude the principal defendant from requesting an extension of time for filing responsive pleadings for good cause shown; and

3. The return date for the co-defendants to file written responses, under oath, to the Writ of Attachment is not extended by this stay; however, this provision does not preclude any co-defendant from requesting an extension of time to file their written response to the Petition for Attachment for good cause shown."

Order of Feb. 13, 1981.

II of the Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran ... are hereby suspended, except as they may be presented to the Tribunal. During the period of this suspension, all such claims shall have no legal effect in any action now pending in any court of the United States...."

Pursuant to that executive order the United States filed in this court on February 26, 1981, a second Statement of Interest of the United States which requested this court to (1) stay litigation of those claims against Iran arguably within the Tribunal's jurisdiction, and (2) vacate the attachments against Iranian assets.

Plaintiff opposed the government's motions challenging the President's authority via executive order to either stay proceedings in this Article III court or to vacate the attachments issued by this court. A hearing was held on March 13, 1981, on the government's motions.[2] The court continued plaintiff's motion to compel examination of the co-defendants pending a ruling on the government's motions.

The government makes two motions in this case which will be considered separately: first, the motion to vacate the prejudgment attachments, and second, the motion to stay. While the ultimate issues in the matter are constitutional—whether the President has the power to negotiate the settlement of an international crisis by agreeing to transfer foreign owned assets (frozen by an earlier executive order) out of this country despite court ordered attachments and to agree that claims on these assets by American citizens will proceed not in the domestic courts but in an international tribunal—the court need not here, and does not, reach the constitutional question with respect to the government's motion to stay.

With respect to the attachments the constitutional question cannot be avoided.

Does the President have the power to make an international agreement, one of the elements of which is the marshalling and transferring of foreign assets out of the country notwithstanding prejudgment attachments issued by a federal district court? And does that executive agreement have the force of law in this country?

Under Article II of the Constitution the President has the power to exercise the sovereign power of the United States in foreign relations and has the power to enter into agreements with foreign governments. *United States v. Pink*, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1939). The President's constitutional power in this case is augmented by statutory power granted him by the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 *et seq.*, which explicitly authorizes the President to "compel ... any ... transfer [of] any property in which any foreign country or a national thereof has any interest." He is also given the power to "nullify, void, prevent or prohibit any right ... with respect to ... any property in which any foreign country or a national thereof has any interest." It is true that IEEPA does not, in terms, give the President the power to annul prejudgment attachments issued by federal courts. Nevertheless the power to *compel any transfer* and to *nullify any right* to any such foreign property can fairly be read to include the power to vacate prejudgment attachments. The court does not agree with the analysis of the legislative history advanced by plaintiff in this case to the effect that the passage of IEEPA as Title II of Public Law 95–223 on December 28, 1977, withdrew any power the President had previously under the Trading with the Enemy Act of 1917 (TWEA) with respect to the nullification of attachments. It is true that IEEPA was the result of congressional intent to particularize and limit to some extent the President's emergency powers in times of national emergen-

---

**2.** The principal defendant, the Government of Iran, made no appearance at the hearing nor at any previous hearing, nor has it answered the complaint, or filed any pleadings in this matter.

cy short of war. Section 5(b) of the TWEA, 50 U.S.C. App. § 5(b), gave the President virtually unlimited emergency powers both in time of war "or during any other period of national emergency declared by the President." What the IEEPA did was to restrict some of the powers of the President in these "other" emergencies short of war. But IEEPA regranted to the President in the identical language of the TWEA the power to compel the transfer of foreign assets, and to nullify any rights in them.

IEEPA does limit the powers previously conferred by TWEA in national emergencies short of war in the following respects: (1) the power to vest, i. e., to take title to foreign property; (2) the power to regulate purely domestic transaction; (3) the power to regulate gold or bullion; and (4) the power to seize records.[3] *See House Report on Trading with the Enemy Act Reform Legislation,* H.R.Rep.No.459, 95th Cong.2d Sess. 15 (1977). These limitations in no way restrict the President's power and authority to do what he did here.

■■■ Plaintiff's counsel suggested at the hearing that he questioned the President's power to marshall and transfer Iranian assets without vesting them in the government. The power to transfer does not require vesting in the government. The fact that IEEPA excludes the power to vest does not restrain the President from doing what he attempts to do here—transfer assets frozen in this country back to Iran and into escrow accounts abroad. The court also rejects the proposition that IEEPA and its predecessor statute in the TWEA is an unconstitutional grant of authority by the Congress to the President. Although plaintiff does not explicitly raise this point in this case, the district court in *Electronic Data Systems Corporation Iran v. The Social Security Organization of the Government of Iran,* 508 F.Supp. 1350 (N.D. Tex.1981), as an alternative holding concluded "that the Act [IEEPA] itself is not in harmony with the United States Constitution." At 1364. Without engaging in an extended discussion of this point except to disagree, the court calls attention to *United States v. Yoshida Int'l.,* 526 F.2d 560, 573 n. 16 (C.C.P.A.1975)[4] which noted, "The TWEA has been considered by many different courts in hundreds of cases involving a variety of executive actions .... It has nevertheless survived every attack on its constitutionality." The court also rejects the proposition that the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602 *et seq.,* is a grant of jurisdiction to federal courts in conflict with the President's action here. The FSIA is a codification of the then existing international law with respect to sovereign immunity and is not an independent grant of jurisdiction to the courts that was not had before. Rather it is a designation of the judiciary as the proper authority to rule on asserted claims of sovereign immunity previously determined by the State Department. The preamble of the FSIA found at 28 U.S.C. § 1602 states: "Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities. Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter." Plaintiff's efforts to transform the FSIA into a grant of jurisdiction which limits the powers of the President under IEEPA are misplaced.[5]

---

**3.** These powers are still available in time of war under the amended TWEA.

**4.** *Yoshida* upheld the 1971 presidential proclamation imposing a 10 per cent import duty surcharge on all dutiable items under the authority of the TWEA.

**5.** There is a serious question, not raised by any party, of whether Iran has a defense under the FSIA to the court's authority to continue prejudgment attachments against property of Iran subsequent to the lifting of the freeze order. 28 U.S.C. § 1610(d) states: "The property of a foreign state ... shall not be immune from attachment prior to the entry of judgment ... if—(1) the foreign state has explicitly waived

■ The valid exercise of the President's constitutional power in the sphere of foreign relations has the force of law and is to be applied by the courts as the law of the land. *Missouri v. Holland,* 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920); *United States v. Pink, supra.*

■ The fact that there were Iranian assets here to attach is due in large measure to the lawful act of the President freezing those assets by Executive Order No. 12170, 44 Fed.Reg. 65729 (Nov. 15, 1979), after the seizure of the American hostages on November 4, 1979. Those assets in American hands were a legitimate bargaining chip at the disposal of the President in negotiations with Iran for the release of the hostages. It would be meaningless to recognize the power of the President to negotiate with frozen Iranian assets if he did not also have the power to transfer them at the conclusion of the negotiations. The release of the attachments is a necessary concomitant of the President's foreign relations power under the Constitution and is further authorized by Congress under IEEPA.

■ Accordingly, this court finds that with respect to that part of the agreement with Iran regarding the transfer of its frozen assets, the President exercised valid constitutional and statutory power and that the executive order vacating the attachments has the force of law. The motion to vacate the attachments in this case is granted. This ruling moots plaintiff's motion to compel examination of the co-defendants.

The considerations with respect to the motion to stay proceedings on the underlying claim are different. In its brief and in oral argument the United States denied it was attempting to negate the jurisdiction of the court over the underlying claim. The motion to stay implies recognition of contin-

uing jurisdiction in this court. The government recognized that certain claims may not be within the jurisdiction of the arbitral tribunal. Brief for Government at 23. The agreement with Iran specifically excludes from the Tribunal "claims arising under a binding contract between the parties specifically providing that any disputes thereunder shall be within the sole jurisdiction of the competent Iranian courts...." Declaration II, Art. II. The government suggests that this court should attempt to require the Iranian defendants to take a position on the arbitrability of the claim in this court. Brief for Government at 25. "If the claimant believes that its claim is not subject to arbitration and Iran agrees, the litigation should be allowed to continue." *Id.*

There is nothing in the record of this case to indicate whether Unidyne's claim falls within or without the purported jurisdiction of the International Tribunal. Counsel for the United States indicated at the hearing that he had not seen the Unidyne contract and did not know anything about the specifics of the Unidyne claim. The government seems to take the position that the arbitrability of the claim should be established in this court. The jurisdiction of the court is not challenged by any party at this time. The question of a stay is within the sound discretion of the court. And the court sees no reason to order a stay at this time. Denial of the stay does not imperil the President's power to implement the agreement with Iran since the Iranian assets are free from attachment and may be transferred according to that agreement. Nor does the denial of the stay impede the establishment of the international tribunal and the lodging of claims there. Allowing the matter to go forward here does protect plaintiff's rights should its claim not be arbitrable and in the event that changed

its immunity from attachment prior to judgment...." The Treaty of Amity, Economic Relations and Consular Rights Between the United States and Iran, August 14, 1955 (1957), 8 U.S.T. 899, T.I.A.S. 3853, may or may not make the required waiver. Also unexplored here is the effect of the earlier freeze of assets on Iran's position. *See New England Merchants National Bank v. Iran Power Generation*

*and Transmission Company,* 502 F.Supp. 120 (S.D.N.Y.1980), where the court held that although Iran had made no explicit waiver of its immunity to prejudgment attachment and would not otherwise be subject to such action in domestic courts, the President's executive order freezing Iranian assets set aside the defense of privilege of sovereign immunity. *Id.* at 126, 131.

circumstances alter the availability of the tribunal. Consequently the motion for a stay will be denied.