# Review of Domestic and International Legal Implications of Implementing the Agreement with Iran

While a number of the presidential actions implementing the agreement with Iran are likely to be the subject of domestic legal challenge, a review of the authorities previously relied on by the Office of Legal Counsel and by the Attorney General in his January 19, 1981, opinion leads to the conclusion that those actions are well within the President's power under the Constitution and applicable statutes and treaties.

A persuasive argument can be made that the agreement with Iran was procured by the threat or use of force in violation of principles of international law, and is thus void *ab initio* under Article 52 of the Vienna Convention on the Law of Treaties. As the party coerced, the United States may decide whether it wishes to repudiate the agreement, though it would be desirable to seek confirmation of the appropriateness of that action from an independent legal body, such as the International Court of Justice. Private litigants would have no standing to contest in United States courts any decision that the President may make in this respect.

Should the United States decide to repudiate the agreement with Iran, a number of questions would arise relating to the disposition of Iranian assets already transferred to the escrow account pursuant to the agreement, or still frozen in domestic accounts.

January 29, 1981

## MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This responds to your request for our views regarding certain legal questions arising out of implementation or nonimplementation of the agreement of January 19, 1981, between the United States and Iran, which resulted in the release of the 52 Americans held hostage in Iran. The first section of the memorandum discusses the legal issues that are likely to be raised in litigation challenging the agreement. The second section sets forth the legal basis for securing a judicial determination that the agreement is void. The third section identifies and analyzes the impact that nonimplementation might have on Americans with claims against Iran and the litigation that could be expected to arise out of a decision not to implement the agreement.[1]

---

[1] The agreement adhered to by the United States and Iran is set forth primarily in two documents, captioned "Declaration of the Government of the Democratic and Popular Republic of Algeria" (Declaration), and "Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran" (Claims Settlement Agreement). Other documents subsidiary to these documents will be described as necessary. The overall agreement was implemented in most particulars through a series of executive orders issued by President Carter on January 19, 1981. Exec. Order Nos. 12,276–12,285, 3 C.F.R. 104–118 (1982).

## I. Domestic Legal Issues

The major legal issues that we expect to be raised in litigation challenging the implementation of the agreement, if the United States chooses that course, concern the scope and limits of presidential power to deal with the hostage crisis. The following presidential actions are likely to be challenged as having been taken without legal authority:

1. Settlement of claims of American citizens against Iran by submission of claims to binding arbitration by an international tribunal;
2. Nullification of outstanding attachments against property of Iran;
3. Ordering the return of the frozen assets to Iran;
4. Prohibition against the prosecution of any claim arising out of the seizure and detention of the 52 American citizens; and
5. Blocking the transfer of the former Shah's property located in the United States.

The legal authority for each of these actions and relevant legal issues are discussed below.

### A. Settlement of Claims by Submission to Binding Arbitration

It is likely that if the agreement is implemented, a fundamental issue will be the President's authority to settle claims of American citizens by agreeing to submit those claims to binding arbitration. Because of the legal precedent and historical practice supporting this action, any challenge on this ground is not likely to prevail.

The authority of the President under Article II of the Constitution to enter into executive agreements with other nations to settle claims has been explicitly upheld by the Supreme Court. *United States* v. *Belmont,* 301 U.S. 324, 330–31 (1937); *United States* v. *Pink,* 315 U.S. 203 (1942). As Justice Frankfurter observed in his concurring opinion, "That the President's control of foreign relations includes the settlement of claims is indisputable." 315 U.S. at 240. *See also* Restatement (Second) of Foreign Relations Law of the United States § 213 (1965). *Belmont* and *Pink* upheld the Litvinov Assignment, by which outstanding Soviet claims were assigned to the United States by a single exchange of letters between the President and the Soviet Foreign Minister. Both cases emphasized the Executive's exclusive constitutional power to recognize foreign governments and to normalize diplomatic relations with them, and viewed claims settlements as necessary incidents of the Executive's foreign relations power. *See generally United States* v. *Curtiss-Wright Export Corp.,* 299 U.S. 304 (1936).

This exercise of the President's foreign relations power is also supported by the Treaty of Amity, Economic Relations, and Consular Rights, Aug. 15, 1955, United States-Iran, Art. XXI(2), 8 U.S.T. 901, T.I.A.S. No. 3853. In ratifying that treaty, the Senate gave its approval for the two nations to settle disputes regarding interpretation of the

treaty by submission to the International Court of Justice or by any pacific means for settling these disputes. Because the treaty provides for peace and friendship between the two nations, trade and commercial freedom, protection and security of nationals, prompt and just compensation for the taking of property, and the absence of restrictions on the transfer of funds, the private claims expressed by the United States and referred to the Tribunal are disputes between the United States and Iran "as to the interpretation or application of the . . . Treaty."

Support may be drawn as well from the President's statutory power under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 *et seq.* (Supp. I 1977). That statute, which authorized the November 14, 1979, blocking of Iranian assets, was drafted in explicit recognition that the blocking of assets could have as a primary purpose their preservation for later claims settlement. H.R. Rep. No. 459, 95th Cong., 1st Sess. 17 (1977); S. Rep. No. 466, 95th Cong., 1st Sess. 6 (1977). Thus, § 1706(a)(1) authorizes the continuation of controls after the underlying emergency has ended, where "necessary on account of claims involving such country or its nationals." The need to provide a means for orderly termination of a blocking of assets once the emergency has passed implies presidential power to resolve the plethora of claims that will invariably arise.

The law known as the Hostage Act, 22 U.S.C. § 1732, also provides an independent statutory authority for the settlement of claims by executive agreement when the settlement is in connection with negotiations for the release of American citizens wrongfully detained by a foreign government. The Act confers upon the President the broad power to "use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate [their] release."

Historical practice also reflects the existence of presidential power to settle claims. Although claims settlements have often been concluded by treaty or convention, historical examples abound of settlements through executive agreement. Numerous lump-sum agreements have settled claims of American nationals against foreign nations. *See, e.g.,* Claims Settlement Agreement, July 16, 1960, United States-Poland, 11 U.S.T. 1953, T.I.A.S. No. 4545; Claims Settlement Agreement, July 19, 1948, United States-Yugoslavia, 62 Stat. 2658, T.I.A.S. No. 1803. History also provides numerous examples of claims settlements through executive agreements that establish international arbitrations rather than provide a lump sum. *See generally* W. McClure, International Executive Agreements 52–56 (1941). In 1935, a congressional study identified 40 arbitration agreements entered into by the Executive between 1842 and 1931 which were not submitted to the Senate for advice and consent. 79 Cong. Rec. 969–71 (1935).[2]

---

[2] The corollary to the power to settle claims of American citizens by submitting the claims to binding arbitration is the power to prohibit any prosecution of claims in court.

## B. Nullification of Outstanding Attachments

Pursuant to the agreement with Iran, President Carter issued Executive Order No. 12,277, 3 C.F.R. 105 (1982), which revoked the authorization for, and nullified all interests in, the frozen Iranian government property except the interests of Iran and its agents. The effect of this order was to void the rights of plaintiffs in any possible litigation to enforce certain attachments and other prejudgment remedies that were issued against the blocked assets following the original blocking order. In implementing the agreement, the United States is likely to face numerous challenges by the attachment holders against the transfer of the attached funds to the Federal Reserve Bank (Fed) and ultimately to Iran. The attachment holders can be expected to argue that with the issuance of the attachment orders, they acquired a vested right to prove their claims and recover against the attached property and that this right may not be taken away by the Executive. We believe that the attachment holders will not succeed in preventing the transfer of the attached funds to the Federal Reserve Bank, although the litigation, including the appeals, will make difficult compliance with the United States' pledge to Iran to effect the transfer within six months.

We believe that the law is clear that the President had the power to nullify the attachments.[3] Under IEEPA, the President has authority in time of emergency to prevent the acquisition of interests in foreign property and to nullify new interests that are acquired through ongoing transactions. The original blocking order delegated this power to the Secretary of the Treasury, who promulgated regulations prohibiting the acquisition, through attachment or any other court process, of any new interest in the blocked property. The effect of these regulations was to modify both the substantive and the procedural law governing the availability of prejudgment remedies to creditors of Iran. The regulations contemplated that provisional remedies might be permitted at a later date but provided that any unauthorized remedy would be "null and void." 31 C.F.R. § 535.203(e).

Subsequently, all of the attachments and all of the other court orders against the Iranian assets held by the Fed were entered pursuant to a general license or authorization given by the Secretary of the Treasury effective November 23, 1979. This authorization, like all authorizations issued under the blocking regulations, was revocable at any time in accordance with 31 C.F.R. § 535.805, which expressly provides that

---

[3] It is also our opinion that, in any event, the attachments were void because they were barred by the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 et seq. Two district courts have adopted that view. E-Systems, Inc. v. Islamic Republic of Iran, 491 F. Supp. 1294 (N.D. Tex. 1980); Reading & Bates Corp. v. National Iranian Oil Co., 478 F. Supp. 724 (S.D.N.Y. 1979). Contra, Behring Int'l, Inc. v. Imperial Iranian Air Force, 475 F. Supp. 383 (D.N.J. 1979). See also New England Merchants Nat'l Bank v. Iran Power Generation & Transmission Co., 502 F. Supp. 120 (S.D.N.Y. 1980) (holding that the Foreign Sovereign Immunities Act barred prejudgment attachment of Iranian assets but that the operation of the Act was suspended by Executive Order No. 12,170's freezing the assets).

any authorization issued under the blocking order could be "amended, modified, or revoked at any time." Because the original authorization was subject to the reservation that it might be revoked at any time, the President could lawfully extinguish any interest created by the attachment by exercising that reservation. *See Orvis* v. *Brownell,* 345, U.S. 183 (1953).

A related issue that may be raised by holders of attachments against funds that have already been transferred to Iran is the legality of a transfer without prior hearing and judicial dissolution of outstanding attachment orders and preliminary injunctions. We believe that no prior hearing was required because the precarious nature of the negotiations warranted swift presidential action to achieve the resolution of the emergency. *United States* v. *Yoshida Int'l, Inc.,* 526 F.2d 560, 573 (C.C.P.A. 1975). Moreover, because the authorization for attachments could be revoked at any time, the attachment holders, under traditional due process analysis, were not entitled to a prerevocation hearing. *Cf. Bishop* v. *Wood,* 426 U.S. 341 (1976). Finally, it was not necessary for the government to obtain a judicial dissolution of the attachments before transferring the assets because presidential action in revoking the authorization for the attachments removed the underlying legal predicate for the attachment orders and expressly authorized the conduct that had been previously forbidden by the attachment order. *See Pennsylvania* v. *Wheeling & Belmont Bridge Co.,* 59 U.S. (18 How.) 421 (1855).[4]

## C. Return of the Frozen Assets to Iran

Pursuant to the agreement, the frozen assets held by the Fed, as well as the frozen assets held by overseas branches of United States banks (less payments on outstanding loans and the amount held in escrow to cover disputed amounts of unpaid principal and interest) have already been returned to Iran. The agreement also provides that the remaining frozen assets in the United States will be returned upon establishment of a security account to satisfy awards made by the international arbitral tribunal. This eventual return of the bulk of the frozen assets to Iran will probably give rise to litigation challenging the President's authority to order such a return. In our opinion, presidential authority to issue such an order is clear.

Under IEEPA, the President is empowered to "direct and compel . . . any . . . transfer [or] withdrawal . . . of . . . any property in which any foreign country or national has an interest." 50 U.S.C. § 1702(a)(1)(B). Upon nullification of any provisional remedies encumbering the assets, the President was free to exercise his power to order

---

[4] Because these assets have already been transferred from the control of the United States to Iran, litigation concerning the exercise of this power will be limited to defense on a show cause order issued against federal officials involved in directing or executing these actions.

the transfer of the assets, which was in effect the withdrawal of the assets by Iran.

### D. Prohibition of Prosecution of Hostage Claims

President Carter, acting pursuant to the agreement, has ordered the Secretary of the Treasury to promulgate regulations prohibiting the prosecution of any claims arising out of the seizure of the United States embassy in Iran and the subsequent detention of the American hostages. This prohibition is a sensitive issue that is likely to be challenged to be without authority, as well as a Fifth Amendment "taking" without just compensation and a denial of equal protection.

As discussed above, the President has the power under IEEPA and the Hostage Act to take steps in aid of his constitutional authority [5] to settle claims of the United States or its nationals against a foreign government. Thus, he has the right to license litigation involving property in which a foreign national has an interest. That license can be suspended by the Executive acting alone. *New England Merchants National Bank* v. *Iran Power Generation & Transmission Co.,* 508 F. Supp. 47 (S.D.N.Y. 1980) (Duffy, J.). *But see National Airmotive Corp.* v. *Government and State of Iran,* 499 F. Supp. 401 (D.D.C. 1980) (Greene, J.).

The Court of Claims has suggested in dicta that if the President settles a claim for less than "value" for unrelated foreign policy purposes, a taking for public use occurs. *See Gray* v. *United States,* 21 Ct. Cl. 340 (1886); *Meade* v. *United States,* 2 Ct. Cl. 224 (1866), *aff'd on other grounds,* 76 U.S. (9 Wall.) 691 (1869). Some of the former hostages or their families may rely on this dicta to seek compensation from the United States, arguing that prohibiting them from prosecuting their claims against Iran amounts to a taking without just compensation. Whatever the vitality of the *Meade* and *Gray* dicta, the hostage claims are distinguishable because they are held by persons whose benefit was a prime purpose of the Administration's negotiations to settle the crisis. Even though that settlement has been reached, the courts are not likely to question whether release could have been secured without settlement or extinction of the tort claims in return. *Cf. Aris Gloves, Inc.* v. *United States,* 420 F.2d 1386 (Ct. Cl. 1970).

The foregoing conclusion regarding the difficulty of identifying loss to the hostages and their families as a result of a claims settlement is reinforced by analysis of their prospects for tort recovery absent an agreement. It seems unlikely that they could recover damages against Iran in United States courts. The Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(5), provides for jurisdiction for an award of tort damages against a foreign state only "for personal injury or death . . .

---

[5] *See, e.g.,* Restatement (Second) of Foreign Relations Law of the United States § 213 (1965).

occurring in the United States." Torts to the hostages have not occurred in the United States. In support of claims by their families for such torts as intentional infliction of emotional distress, it could be argued that the statute is ambiguous regarding whether it is enough for the injury to occur here even if the tortious actions do not. The Act's legislative history, however, emphasizes that the immunity of foreign states for their "public" acts as opposed to "commercial or private" acts is to be maintained and that the exception for torts in the United States "is directed primarily at the problem of traffic accidents," suggesting that the wrong must occur here to be actionable. H.R. Rep. No. 1487, 94th Cong., 2d Sess. 7, 20 (1976).

Finally, the "takings" question may become moot. If the Hostage Compensation Commission recommends that Congress compensate the hostages and their families and Congress acts upon such a recommendation, there will be no taking.

If the hostages and their families receive no compensation for their claims, they may also argue that in obtaining satisfaction from Iran for the commercial claims but not for the hostage claims, the government denied them equal protection in violation of the Fifth Amendment. In our view, that argument will not prevail. Prohibiting prosecution of the hostage claims can be justified for equal protection purposes as the best "deal" that could be struck with Iran for their release. As such, it is rationally related to and it furthers a legitimate governmental interest and thus does not deny equal protection. The determination by the President that precluding prosecution of the hostage claims facilitated the release of the hostages will not be second-guessed by the courts. *See United States* v. *Curtiss-Wright Export Corp.,* 299 U.S. 304 (1936); *Narenji* v. *Civiletti,* 617 F.2d 745 (D.C. Cir. 1979), *cert. denied,* 446 U.S. 957 (1980); *Miller* v. *United States,* 583 F.2d 857, 865 (6th Cir. 1978); *Aris Gloves, Inc.* v. *United States, supra,* 420 F.2d at 1393.

## E. Freezing the Assets of the Former Shah

As part of the agreement, President Carter prohibited the transfer of all property and assets located in the United States of the former Shah of Iran, his estate and his close relatives until litigation involving such property is terminated.[6] Although the Shah's family may well challenge this blocking order, we believe that the President's authority to block the Shah's assets is not open to serious question. IEEPA authorizes the President to block transfers of "any property in which any foreign country or a national thereof has any interest," 50 U.S.C. § 1702(a)(1).

---

[6] Although the United States will not be directly involved in the litigation, Executive Order No. 12,284 directs the Attorney General pursuant to the agreement to present to the court at the request of Iran's counsel a suggestion of interest stating it is the United States' position that Iran's claim against that property is not barred by either principles of sovereign immunity or the act of state doctrine and that Iranian decrees and acts relating to the assets of the former Shah should be enforced by the courts in accordance with our laws.

The application of this language in the predecessor Trading with the Enemy Act to the assets of foreign nationals was firmly established by the time that IEEPA was enacted and has repeatedly survived constitutional challenge. *See, e.g., Sardino* v. *Federal Reserve Bank of New York,* 361 F.2d 106 (2d Cir.), *cert. denied,* 385 U.S. 898 (1966) (upholding the blocking of assets of Cuban nationals).

## F. Conclusion

Although we fully expect legal challenges to be brought to the major actions discussed above, our review of the legal authorities previously relied upon by this Office and the Attorney General in his January 19, 1981, opinion to the President regarding the legality of the actions taken by President Carter convinces us that these actions were well within the power conferred on the President by the Constitution, statutes, and treaty.

## II. Status of the Agreements with Iran under International Law

### A. The Relevance of "Duress"

You have asked us to consider whether the agreement reached with Iran is enforceable under international law, a question not previously addressed by this Office or your predecessor as Attorney General.

The primary source for international treaty law is the Vienna Convention on the Law of Treaties (the Convention), which entered into force in 1980. It has been signed by both the United States and Iran, but neither has yet become a party.[7] It is frequently cited by nonparties, however, as a statement of customary international law. At the time that the Secretary of State sent the Convention to the President for transmittal to the Senate, he said: "Although not yet in force, the Convention is already generally recognized as the authoritative guide to current treaty law and practice." Ex. L., 92d Cong., 1st Sess. 1 (1971). The Executive did not recommend any reservations to the Convention at the time that it was submitted for advice and consent. This action strongly suggests acceptance by the Executive of the Convention's rules.[8]

The Convention includes a number of articles concerning the invalidity of treaties, the most pertinent of which is Article 52. It addresses the issue of coercion of a state by the threat or use of force:

---

[7] It was signed for the United States in 1970 and transmitted to the Senate by President Nixon on November 22, 1971. Ex. L., 92d Cong., 1st Sess. (1971), reproduced at 8 I.L.M. 679.

[8] Hearings on ratification of the Convention were held before the Senate Foreign Relations Committee in 1972 (unpublished), but the Convention was never reported out. The problem was primarily a disagreement between the Senate and President over the authority to make international agreements rather than disagreement about the substance of the Convention.

A treaty is void if its conclusion has been procured by the threat or use of force in violation of the principles of international law, embodied in the Charter of the United Nations.

At the outset, we would observe that the agreement concluded with Iran is a "treaty" within the meaning of the Convention even though it is designated as an executive agreement for purposes of domestic law. The Convention applies to any written international agreement concluded between states which is governed by international law. Art. 2(1)(a).

The principle expressed in Article 52 is of relatively recent origin. Prior to the establishment of the League of Nations, the use of force in international law was generally accepted. Thus, its use to procure treaties was not considered unlawful. Experience under the League and the U.N. Charter led to a fundamental change.[9] Thus, the International Law Commission (ILC), which drafted the Convention, concluded in 1966 that Article 52 stated an *existing* norm of international law. Reports of the Commission to the General Assembly, [1966] 2 Y.B. Int'l L. Comm'n 169, U.N. Doc. A/6309/Rev. 1/1966, at 246 (hereafter 1966 I.L.C. Yearbook).

We believe that a persuasive argument can be made that the agreement with Iran was "procured by the threat or use of force in violation of the principles of international law" in the U.N. Charter, within the meaning of Article 52. The International Court of Justice (ICJ) found that the initial seizure was privately planned, *Case Concerning United States Diplomatic and Consular Staff in Tehran (U.S. v. Iran)* 1980 I.C.J. 3, ¶59, but that the government of Iran failed to take any steps to correct the situation. ¶ 68. The continued holding of the hostages by force enjoyed the "seal of official governmental approval." ¶ 73. It was carried on "for the purpose of exerting pressure on the United States," ¶ 74, and "forcing" the United States "to bow to certain demands," ¶ 91. Thus, the initially private action was transmuted into an act of state. ¶ 74 During this period, three of the hostages were held by the Foreign Ministry itself. ¶ 78. In addition, Iran constantly used threats to put the hostages on trial. ¶ 79

The Court did not have occasion to address directly whether Iran's activity was an illegal use of force under U.N. Charter Article 2(4),[10] or whether the United States' attempt to rescue the hostages was proper self-defense to an "armed attack" under Article 51 of the Charter. The Court's opinion, however, uses words such as "armed," "attack," and

---

[9] T. O. Elias, The Modern Law of Treaties 170 (1974); McNair, The Law of Treaties 209 (1961); Restatement of Foreign Relations Law of the United States (Revised), tentative draft No. 1, § 338 (1980).

[10] "All Members shall refrain in their international relations from the threat or use of force against the territorial integrity or political independence of any state, or in any other manner inconsistent with the Purposes of the United Nations."

"overrun" in describing both the February and November 1979 take-overs, ¶¶ 14, 17, which strongly suggests that it views Iran's activity as an illegal use of armed force.

The formulation in Article 52 goes beyond the prohibitions embodied in Article 2(4) of the Charter. The Vice President of the ICJ has written: "By emphasizing the *principles* of the Charter, the Article implies all those rules and practices of international law which underlie the Charter provisions and which are of general application today." T.O. Elias, *supra,* at 170–71 (emphasis in original). Thus, use of force to violate other basic Charter provisions is relevant.

One such provision is Article 94, under which each member undertakes to comply with the decision of the ICJ in any case to which it is a party. Since May 24, 1980, Iran has used force to defy such a decision and has therefore used force to violate the principles of the Charter.

Although the basic principles are clear, there is a dearth of judicial interpretation of Article 52 and state practice under it. The ICJ considered it briefly in the *Fisheries Jurisdiction Case (U.K. v. Ice.)*, 1973 I.C.J. 1. Iceland, which refused to participate in the case, challenged the validity of an exchange of notes with the United Kingdom conferring jurisdiction on the ICJ. It sent a letter to the Court stating that the exchange took place "under extremely difficult circumstances," when the British navy had been using force to oppose Iceland's fishing limit. The ICJ noted that this could be interpreted as a "veiled charge of duress," ¶ 24, but said that the Court could not consider an accusation of that kind without evidence to support it. It said that the history of the jurisdictional agreement revealed that those instruments were freely negotiated by the parties on the basis of "*perfect equality and freedom of decision on both sides.*" *Id.* (emphasis added). The Court recognized that Article 52 represented "contemporary international law" and that "an agreement concluded under the threat of or use of force is void." This statement was made seven years before the Convention came into force.

The Court's finding that the agreement was not void is not conclusive here.[11] Unlike Iceland, which failed to produce evidence to support its charge, we believe that the United States can convincingly establish the presence of duress in procuring the agreement. Indeed, as we have noted, the ICJ has already found that the illegal acts were "for the purpose of exerting pressure on the United States," ¶ 74, and used the words "coercing" and "coercive" in this context. ¶ 87. There would appear to be no reason why, for example, the United States should have dropped its claim for compensation and the claims of the hostages (Declaration ¶ 11)—claims which had already been established in the

---

[11] *The Fisheries Jurisdiction Case* can also be viewed as a situation in which the ICJ was, understandably, protecting its own jurisdiction. In this case, by contrast, the Court would protect its jurisdiction by voiding our agreement to withdraw our case against Iran from the ICJ.

ICJ (Judgment of May 24, 1980)—except for the threat against the hostages.

## B. The Consequences of Duress

If one accepts this reading of Article 52 and the proposition that it applies to the agreement with Iran, then the conclusion that would follow is not that the United States has to break its agreement but that there never was an agreement: it was void *ab initio.* The question whether such an agreement should be void or merely voidable was considered by the ILC, which indicated the need, as a matter of international policy, to eliminate the consequences of coercion:

> The prohibitions on the threat or use of force contained in the Charter are rules of international law the observance of which is legally a matter of concern to every State. Even if it were conceivable that after being liberated from the influence of a threat or of a use of force a State might wish to allow a treaty procured from it by such means, the Commission considered it essential that the treaty should be regarded in law as void *ab initio.* This would enable the State concerned to take its decision in regard to the maintenance of the treaty in a position of full legal equality with the other State. If, therefore, the treaty were maintained in force, it would in effect be by the conclusion of a new treaty and not by the recognition of the validity of a treaty procured by means contrary to the most fundamental principles of the Charter of the United Nations.

1966 I.L.C. Yearbook at 247.

The ILC analysis raises several pertinent points. First, by clear implication it recognizes that negotiating a treaty under duress is not a violation of international law insofar as the state being subjected to duress is concerned. Thus, the negotiation of the agreement by the United States was proper as a matter of domestic *and* international law.

The ILC analysis also points out that once the coercion has been removed, the coerced party is free, as a matter of international law, to adhere to that treaty. Thus, the President would act in full accord with international law were he now to decide to maintain the agreement. It is not clear what procedure would be preferable to implement a decision to maintain the agreement. Because concluding the agreement was within the Executive's power, a simple statement acknowledging that the United States wishes to maintain the agreement, even after the release of the hostages, should suffice.[12]

---

[12] An example of confirming state practice is the 1973 treaty between the Federal Republic of Germany and Czechoslovakia, which replaced the 1938 Munich Agreement and stated it to be "void" because imposed under threat of force. T.O. Elias, *supra,* at 176.

Finally, the President may act, also fully consistent with international (and domestic) law, to repudiate the agreement. If the President wishes to treat the agreements as void, he must treat them as completely so. Article 44(5) of the Convention provides that in cases falling under Article 52, no separation of the provisions of the treaty is permitted. The ILC took the position that this rule was necessary to permit the coerced State to act in a position of full freedom from coercion. 1966 I.L.C. Yearbook at 239.

The consequence of repudiation would be that the United States could, in theory, demand that Iran establish the position that would have existed prior to the agreement. Thus, the United States could ask for return of the money paid over to Iran. Iran, as the party to which coercion is imputable, does not have a similar right. *See* Article 69 of the Convention. Thus, it cannot demand return of the hostages. The United States would then be left with the means of redress available elsewhere through self-help or international adjudication for both the coercive acts and their consequences. 1966 I.L.C. Yearbook at 264. *See* Part III(B), *infra.*

## C. Litigating the Issue of Duress

If the United States were to repudiate the agreement, it would be desirable, for reasons of self-protection and international relations, to seek confirmation from an independent body, particularly the ICJ. It should be possible to present the issue to the ICJ relatively quickly. In its judgment of May 24, 1980, the ICJ decided that the form and amount of reparation to be paid by Iran "shall be settled by the Court." Because the Court thus reserved its jurisdiction in the case, the United States could simply move for the designation of a master or other appropriate method for taking evidence of damages. Under the Declaration, the United States agreed to withdraw the case. Iran would thus be forced to raise the Declaration as a bar to halt the case, and the ICJ would be directly presented with the issue of duress. [13]

Iran might choose to secure a determination of this matter from the Iran-United States Claims Tribunal, as established under the Claims Settlement Agreement, by proving our default with regard to paying the balance due to Iran. If the agreement is void and its provisions are inseparable, then the United States would take the position that the Tribunal has no authority. Iran could in theory designate three members and, failing designation by the United States, apply under Article 7 of the UNCITRAL rules, 15 I.L.M. 705, for designation of the remaining arbitrators. *See* Claims Settlement Agreement, Art. III(2). We doubt

---

[13] We note that, under 28 U.S.C. §§ 516 and 519, conduct of this litigation is reserved to the Attorney General. The Legal Adviser of the Department of State is, of course, an active participant in such litigation.

that Iran could quickly constitute the Tribunal and obtain a judgment, given both the technical and legal problems and the time factors built into the agreement. The Tribunal is given jurisdiction "over any dispute as to the interpretation or performance of any provision" of the Declaration, which conceivably includes whether nonperformance by the United States based on a defense of duress was justified. There may be some way that the United States could make this point to the Tribunal without conceding its authority. If the ICJ ruled first and held the agreement to be a nullity, the Tribunal would be bound by that decision.[14]

A further issue is whether the issue of duress can be adjudicated in our domestic courts. Litigants may attempt to argue that the agreements are void even if the President decides to carry out the agreements; conversely, Iran may argue their validity as a bar to litigation even if the government decides that they are void. We believe that any decision made by the President as to duress is solely his to make and will not be reviewed by the courts, which can be expected to view it as a political question. A plurality of the Supreme Court held that President Carter's decision to terminate the Taiwan Defense Treaty was a political question. *Goldwater* v. *Carter,* 444 U.S. 996 (1979). We believe that the reasons for that decision are even more compelling here because, as explained in the Attorney General's opinion of January 19, the agreement with Iran was an executive agreement, which is the Executive's to make and to terminate and which does not require participation by the Senate. *Cf. Charlton* v. *Kelly,* 229 U.S. 447, 476 (1913); Restatement (Second) of Foreign Relations Law of the United States § 163 (1965).

## D. Conclusion

For the reasons set forth above, we conclude that: (1) a persuasive case can be established that the agreement with Iran is void *ab initio* under international law; (2) the negotiation of the agreement was not a violation of international laws; (3) the President may, fully consistent with international law, either repudiate or maintain the agreement; (4) if the President decides to repudiate the agreement, confirmation of the appropriateness of that action should be sought in the ICJ; and (5) private litigants have no standing to contest in our courts any decision that the President may make.

---

[14] The agreement by the United States to arbitrate does not mean that we have to present the case for voidness to the Tribunal rather than make that decision ourselves. The Tribunal is not given *exclusive* jurisdiction over these questions. If the agreement is void, the Tribunal has no authority. Moreover, the existence of an arbitration agreement does not preclude measures of self-help taken in good faith. *See* L. Damrosch, *Retaliation or Arbitration—or Both? The 1978 United States-France Aviation Dispute,* 74 Am. J. Int'l L. 785 (1980).

## III. Legal Considerations Arising from Nonimplementation of the International Agreement with Iran

Three important questions that would arise from a decision not to implement the executory portions of the international agreement with Iran are:

1) What would become of the $1.418 billion in the escrow account at the Bank of London (currently being held under the terms of the "Undertakings" for payment of disputed amounts between the Bank Markazi and the United States banks);

2) Can the still frozen domestic assets, including bank assets, other financial assets, and other Iranian governmental assets, be used to satisfy claims by United States nationals against Iran; and

3) What rights will the hostages and their families have to sue Iran for damages, and what possibility exists for collection of any award made?

The following discussion proceeds on the assumption that the United States, following an executive decision against implementation, secures a judgment from the ICJ or otherwise determines that the agreement is void.

### A. The Escrow Account

The Undertakings provide that $1.418 billion of the Fed and foreign bank assets previously transferred to the escrow account at the Bank of London shall be retained for the purpose of paying to U.S. banks any unpaid principal or interest on loans to Iran and paying to Iran any deposits, assets, or interest owing on Iranian deposits. The division is to be made by the agreement of the Bank Markazi and the appropriate U.S. bank; or, failing agreement on the amount, by reference to an international arbitration panel as the parties might agree; or failing agreement on a panel, by the Iran-United States Claims Tribunal. No other provision is made for distribution of the account.

The agreement between the banks—and the obligations and rights thereunder—is arguably severable from the international agreement. But the overall context of the bank agreement, as well as the provision of terms and conditions for the escrow account in the Undertakings document, signed by the United States, may well make this argument unpersuasive. Thus, as discussed in Part II above, the Technical Arrangement between the banks, which implements the Undertakings, might well fall within the international agreement. In the time available, we have been unable to assess the consequences of such failure.

327

## B. Claims of United States Nationals

The domestic bank assets, valued at approximately $2.2 billion, and other Iranian assets, valued at approximately $1 billion, remain in this country. The first step of the two-step transfer process—to the Fed and then to Iran—is underway, subject to litigation. The second step depends upon adherence to the Claims Settlement Agreement, including establishment of a Claims Settlement Tribunal. The Security Account is to be opened at $1 billion (taken from the $2.2 billion in domestic bank assets) and replenished by Iran with "new" money if it drops below $500 million as awards are made.

Nonimplementation would preclude funding of the Security Account. Presumably, the domestic assets could be used directly for settling the claims. The claims settlement procedure would require legislation to vest the assets and confer jurisdiction on the Foreign Claims Settlement Commission or a comparable body to hear and determine claims and make awards. One theoretical difference is that the amount that the Claims Tribunal can award has no upper limit, while the total of awards against the domestic assets would of course be limited to about $3.2 billion. It is also possible that damages assessed by the ICJ in the course of that litigation could, with congressional approval by statute, be made available for the satisfaction of private claims. The only claims now pending, however, relate to the embassy seizure and not to commercial disputes. We would add, however, that if the United States prevails in the ICJ we could expect difficulty in collecting anything on any judgment other than by self-help. Judgments of the ICJ are not directly enforceable in domestic courts.

Iran ignored the ICJ's judgment in May 1980, which ordered Iran to cease its illegal acts. The Security Council has power under Article 94 of the U.N. Charter to enforce ICJ judgments and could, in theory, impose economic sanctions, a break in diplomatic relations, or other penalties on Iran for failure to pay. Experience has shown, however, both in this case and in others, that the Security Council, for political reasons, has generally failed to support the ICJ.

As noted in Part II, if the ICJ were to confirm that the agreement is void, the United States may, in theory, ask for return of the assets paid over to Iran as well as damages to the United States and its nationals. Iran can be expected to reply, if it participates, that the assets were theirs in any event and that the United States has no right to return of the assets. There is a question whether any judgment will exceed what we already control. An ICJ judgment would serve, however, to give legitimacy to any action we may take in vesting Iranian assets already in our control.

## C. The Hostage Claims

In ¶ 11 of the Declaration, the United States agreed to preclude prosecution of any claim related to the seizure and detention of the hostages. We have previously expressed the view that recovery against Iran on a tort claim seemed unlikely in the absence of an amendment to the Foreign Sovereign Immunities Act, which presently provides for tort damages for personal injury or death occurring in the United States and not resulting from a discretionary function. 28 U.S.C. § 1605(a)(5). We also believe, however, that an amendment to that Act could impose retroactive tort liability on Iran. Presumably, funds to pay out on any judgments secured would have to come out of the frozen assets after vesting or out of funds, if any, collected under an ICJ judgment.

It should be noted that during the period in which the United States was pressing its claim that the agreement is void before the ICJ, we might not meet certain of our obligations under the agreement. Such "breaches" could then lead to awards against the United States by the Claims Tribunal in the unlikely event that the ICJ ultimately ruled against the United States.

## D. Conclusion

In the short time available, we have identified three of what we believe would be the most important issues to be confronted if the agreement with Iran were not implemented. We are concerned, however, that other problems may arise, particularly the possibility of claims brought against the United States which might result in the imposition of liability on the government. We are exploring these potential problems as quickly as possible.

LARRY L. SIMMS
*Acting Assistant Attorney General*
*Office of Legal Counsel*