**READING & BATES CORPORATION,**
**Reading & Bates Exploration**
**Co., Plaintiffs,**

v.

**NATIONAL IRANIAN OIL**
**COMPANY, Defendant.**

**No. 79 Civ. 4421 (KTD).**

United States District Court,
S. D. New York.

Sept. 27, 1979.

Baker & McKenzie, New York City, for plaintiffs; Lawrence W. Newman, Robert B. Davidson, New York City, of counsel.

Abourezk, Shack & Mendenhall, Washington, D. C., Patterson, Belknap, Webb & Tyler, New York City, for defendant; Thomas G. Shack, Jr., Raymond J. Kimball, Washington, D. C., Robert P. Patterson, Jr., William J. Muller, New York City, of counsel.

Shearman & Sterling, New York City, for Citibank, amicus curiae; Henry Harfield, Henry S. Weisburg, New York City, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

Plaintiffs, Reading & Bates Corporation [hereinafter referred to as "R & B"] and Reading & Bates Exploration Company [hereinafter referred to as "R & B Exploration"], both Delaware corporations, brought this motion to confirm an order of attachment issued *ex parte* by me on August 22, 1979. Defendant, National Iranian Oil Company [hereinafter referred to as "NIOC"], a foreign corporation not licensed in New York, cross-moved to vacate the order of attachment and levy.

The complaint in the instant case alleges the unlawful taking and conversion by the defendant of the plaintiffs' oil drilling rig, the "Milton G. Hulme", located in Iranian territorial waters. Jurisdiction of the federal District Court is based on diversity of citizenship. The undisputed facts are as follows:

On November 1, 1977, the plaintiff corporations entered into two contracts with the Oil Services Company of Iran [hereinafter referred to as "OSCO"]. The first contract, the "Bareboat Charter", chartered the drilling rig to OSCO for three years and the second, the "Drilling Contract" was for operation of the rig. OSCO, at that time, was under a service contract with NIOC dated July 19, 1973. Pursuant to this contract, OSCO was to conduct oil and gas exploration and drilling for NIOC. In turn, NIOC was to supply the oil and gas to members of the International Oil Consortium, also formed in 1973. NIOC provided OSCO's funding for the performance of the service contract. Until approximately November, 1978, invoices sent to OSCO by R & B and R & B Exploration were paid in full.

Thereafter, the parties' interpretation of the facts diverges. The plaintiffs claim that no invoices were paid after November, 1978, save two partial payments in March and May, 1979. They further claim that despite urgent need for an inspection of the rig on February 16, 1979, they were physically prevented from doing so. R & B and R & B Exploration also assert that the failure to make required payments terminated the contract pursuant to its "Termination Clause" and that repeated demands have been made for payment and return of the rig. Finally, they assert that NIOC had complete dominion and control over OSCO and is properly before this Court as its "alter ego."

Defendant, on the other hand, argues, *inter alia*, that substantial payments have been made; that R & B had no right to an inspection; that R & B, in fact, violated the "Bareboat Charter" by attempting to tow the rig from Iranian waters; and that plaintiffs have submitted no evidence of a

demand for return of the rig. According to defendant, the contract has not been terminated and, therefore, this cause of action at best sounds in contract; not in conversion. Finally, NIOC persistently argues that it is a separate juridical entity and is not a proper party to this lawsuit.

Both sides concede that there is an arbitration clause in the "Bareboat Charter" between R & B and OSCO. This clause provides that:

All disputes arising in connection with the present Contract shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by one or more arbitrators appointed.

Plaintiffs' Exhibit 1 at 14. However, no demand for arbitration has been made by either party.

Upon commencement of the suit the plaintiffs filed a summons and complaint and an *ex parte* application for an order of attachment on August 22, 1979. The attachment application contemplated a levy of approximately $26 million at each of twenty-nine banks holding funds of the defendant. Only one of the banks indicated that it had no funds of defendant. At least four banks indicated that they each possessed funds of the defendant in excess of the amount to be attached. After the order of attachment was granted, pursuant to N.Y.Civ.Prac.Law § 6201, the parties and garnishee banks agreed by stipulation, dated August 31, 1979, to set aside a special fund of approximately $26 million at the Chase Manhattan Bank in lieu of a levy at each of the twenty-nine banks.

As required by N.Y.Civ.Prac.Law § 6211(b), the plaintiffs made the instant motion to confirm the order of attachment within five days by an order to show cause dated August 27, 1979. I heard oral argument on this motion and the defendant's cross-motion to vacate the attachment on September 7th and reserved decision.

This case involves several distinct issues. First, has the plaintiff met its burden of establishing the grounds for attachment, the need for a continuing levy, and the probability of success on the merits as required by N.Y.Civ.Prac.Law § 6223(b)? Second, is NIOC a proper party to this suit as the "alter ego" of OSCO? Third, if NIOC is a proper party, has its immunity to pre-judgment attachment under the Foreign Sovereign Immunity Act, 28 U.S.C. §§ 1602–11, [hereinafter referred to as the "FSIA"], been waived by the United States Treaty of Amity with Iran?

■ At the outset, it should be noted that the provisional remedy of attachment is discretionary with the trial court. Weinstein-Korn-Miller, N.Y.Civil Practice ¶ 6201.03 (1963). It is a harsh remedy which should be construed strictly against those seeking to use it. *Siegel v. Northern Boulevard & 80th St. Corp.*, 31 A.D.2d 182, 183, 295 N.Y.S.2d 804, 806 (1st Dep't 1968). C.P.L.R. § 6223(b) provides that the plaintiff shall have the burden of establishing the grounds for attachment, the need for continuing the levy, and the probability of success on the merits. This provision is specifically made applicable to the motion to confirm the order of attachment via C.P.L.R. § 6211(b). I find that the plaintiff has failed to meet its burden pursuant to Section 6223(b).

■ Pre-judgment attachments in New York are generally used either to obtain quasi-in-rem jurisdiction over a foreign defendant or to establish security for satisfaction of a potential judgment, or both. In the instant case, plaintiffs contend that there is personal jurisdiction over defendant by virtue of its "doing-business" in New York, N.Y.Civ.Prac.Law § 301 (McKinney), and that

the purpose of an attachment here is not to obtain jurisdiction in the quasi rem [sic] sense, it was done in order to secure any judgment which would be rendered.

Transcript at 50.

■ When the only purpose for a pre-judgment attachment is security, a different analysis should apply than that used for jurisdictional attachments. In *Incontrade, Inc. v. Oilborn International, S. A.*, 407 F.Supp. 1359 (S.D.N.Y.1976) the Court indicated:

When jurisdiction already exists, attachment should issue only upon a showing that drastic action is required for security purposes.

*Id.* at 1361.

Plaintiff has established the grounds for attachment pursuant to C.P.L.R. § 6201. A money judgment has been demanded and would be available against the defendants for conversion and the defendant is a foreign corporation not qualified to do business in New York.

 I find, however, that the plaintiff has failed to establish a need to continue the levy under the circumstances of this case. Plaintiffs argue, based on *Banco Mercantil y Agricolo, C. A. v. Michel,* No. 78–4852 (S.D.N.Y. April 23, 1979), that defendant's unauthorized dominion over the rig to plaintiffs' exclusion, in itself, establishes a continuing need for the levy. I disagree. The defendant in *Banco Mercantil* was an Assistant United States Representative for a Venezuelan bank. She was charged with fraudulently converting bank funds for personal use. The defendant's unlawful dominion was over funds which she never had a right to possess. In that situation, the Court found a continuing need for the levy.

In contrast, defendant in the instant case did have a right to possess the drilling rig pursuant to the "Bareboat Charter." The dispute here is as to whether or not the contract and, consequently, possession rights were terminated pursuant to specific terms of the Termination Clause. Although continuing to assert that it is not a proper party, NIOC argues that OSCO is still under the terms of its three-year lease and has given no indication that it will fail to return the rig at the end of this period. Under these circumstances, I cannot say that possession of the rig alone is a sufficient need to continue the levy.

 Neither can I say that plaintiff has established sufficient insecurity of enforcement of a potential judgment to justify the harsh remedy of pre-judgment attachment. Plaintiffs ask me to accept the possibility that Iran might cut off oil sales to the United States or alter its financial arrangements to require that customers' payments be made outside the United States.[1] The effect of these policy changes would be to reduce NIOC assets in New York. In their brief, plaintiffs indicate that "[t]here is no way of saying with any reasonable degree of certainty that the events described above will not happen." Plaintiffs' Memorandum in Support of Confirmation of Order of Attachment at 20.

NIOC is presently doing substantial business and is party to many long-term contracts with United States customers. The proceedings in this case indicate that it has at least upwards of $700 million on deposit with New York banking institutions. The possibility that NIOC will remove all of its funds from New York and revise all of its contracts to provide for payments outside of the United States is simply too remote to justify continuing the pre-judgment attachment in this case. Certainly, the plaintiffs' contention that there is no way of saying these events will not happen does not satisfy their burden pursuant to Section 6223(b).

Since I find that plaintiffs have failed to meet the burden of establishing need to continue the levy, I need not determine whether or not they have established probability of success on the merits. Moreover, I need not determine at this time whether or not NIOC is, in fact, the "alter ego" of OSCO.

I also need not decide the issue of NIOC's immunity from pre-judgment attachment. However, given Judge Fisher's recent decision of *Behring International, Inc. v. Imperial Iranian Air Force,* 475 F.Supp. 383 (D.N.J.1979) and counsel's extensive oral arguments concerning it, I think it necessary to address the question.

---

1. Plaintiffs cite *Stromberg-Carlson Corp. v. Bank Melli Iran,* 467 F.Supp. 530 (S.D.N.Y. 1979) for the proposition that the Court may take judicial notice of the political turmoil in Iran. This may be so. However, I do not feel it appropriate or helpful to do so in the instant case.

■ *Behring* presented the same issue which is raised here; to wit, has the defendant's immunity to pre-judgment attachment under the Foreign Sovereign Immunity Act, 28 U.S.C. §§ 1601–11, been waived either statutorily pursuant to Section 1610 or by the United States Treaty of Amity with Iran?

Section 1609 of the FSIA is the general provision which grants immunity from attachment to foreign states.[2] That same section, however, provides that it is "subject to existing international agreements to which the United States is a party at the time of enactment of this Act." 28 U.S.C. §§ 1604, 1609. Thus, the Treaty of Amity may alter the provisions of the FSIA. In addition to exceptions created by existing international agreements, Section 1610 provides statutory exceptions to FSIA immunity.

There are different subdivisions of Section 1610 which deal with execution attachment as opposed to pre-judgment attachment. The former may be waived "either explicitly or implicitly," 28 U.S.C. § 1610(b)(1), whereas the latter may only be waived "explicitly," 28 U.S.C. § 1610(d)(1).

In the instant case, as in *Behring*, there was no waiver other than that in the Treaty of Amity. The disputed language of the Treaty reads:

No enterprise of either High Contracting Party, including corporations, associations, and government agencies and instrumentalities, which is publicly owned or controlled shall, if it engages in commercial, industrial, shipping or other business activities within the territories of the other High Contracting Party, claim or enjoy, either for itself or for its property, immunity therein from taxation, suit, execution of judgment *or other liability* to which privately owned and controlled enterprises are subject therein.

Treaty of Amity, Art. XI, para. 4, 8 U.S.T. 899, 909 (1957) (emphasis added).

Judge Fisher in *Behring* decided that the above language "or other liability" was not an explicit waiver of pre-judgment attachment immunity as required by Section 1610(d). I agree.

He further decided, however, that the above language was a sufficient waiver of such immunity pursuant to Section 1609. In so doing, he reasoned that the international agreements to which the FSIA is subject should be governed by ordinary principles of construction and not by analogy to the FSIA. Although Section 1610(d) requires an *explicit* waiver of pre-judgment attachment immunity, it may be *impliedly* waived by Treaty. Despite Judge Fisher's careful opinion, I must respectfully disagree.

Congress was extremely careful to distinguish between the waiver standard for pre- and post-judgment attachments, requiring a more explicit standard for the former. It did so for a reason. Apparently Congress recognized that pre-judgment attachments are potentially more harassing than post-judgment attachments and, therefore, a waiver of immunity from the former should not be lightly implied.

It is true that strict rules of construction do not require that the interpretation of FSIA Section 1610(b) and (d) be binding on

2. A foreign state is defined by the FSIA as including

. . . a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).
(b) An "agency or instrumentality of a foreign state" means any entity—
(1) which is a separate legal person, corporate or otherwise, and
(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.
28 U.S.C. § 1603(a), (b) (West Supp.1979). Even plaintiff concedes that NIOC is a foreign agency to which foreign sovereign immunity would apply but for the alleged waiver, subject, of course, to the exceptions in Sections 1605–7. Plaintiffs' Memorandum in Support of Application for Order of Attachment at 4.

construction of the Treaty of Amity. However, in the interest of consistent policy, it seems that a waiver of pre-judgment attachment immunity should be explicit whether it be by statute or by international agreement.

Moreover, my reading of the rules of construction is that the paramount consideration for a Court in using them is to give effect to the intent of the parties. Whatever "other liability" might cover, it is clear that it did not mean to the sovereign nations using it in the Treaty of Amity that it would subject either one of them to pre-judgment attachment for security purposes only in a suit brought by a private citizen. It is hard to imagine that a sovereign nation, in entering a treaty supposedly to promote commerce, would at the same time even suggest that it would evade a lawful judgment arising out of its commercial activities.

For the above reasons, I believe that even if plaintiffs had sustained their burden of establishing the need for continuing the levy and probability of success on the merits, NIOC would be immune from pre-judgment attachment pursuant to 28 U.S.C. § 1609 despite the Treaty of Amity.

In accordance with the foregoing, the motion to confirm the attachment is denied and the attachment vacated.

SO ORDERED.