OPINION OF THE COURT
Martin Evans, J.
Plaintiffs move to stay defendant Bank Sepah-Iran from removing any assets from the State of New York in connection with the liquidation of its New York agency. At issue is the extent of this court’s power to impose provisional remedies on a foreign sovereign defendant or its instrumentality and the effect of the Foreign Sovereign Immunities Act (FSIA; 28 USC § 1602 et seq.) on the procedural law of this State.
Defendant Bank Sepah-Iran (New York agency) is the New York agency of Bank Sepah-Iran, a banking corporation organized under the laws of Iran. It is agreed by both parties that the Bank has been duly authorized to do business in New York pursuant to State law (Banking Law § 200 et seq.), and *159 that the Bank is now wholly owned and controlled by the present government of Iran.
Plaintiff Seyed Raji was employed on January 16, 1978 by Bank Sepah-Iran to act as its agent in New York to obtain authorization to organize an agency in the State. In addition, Raji was to act as managing director of the agency after it was formed. In the aftermath of the Iranian Islamic revolution, the new government assumed ownership and control of Bank Sepah. On March 31, 1979, Bank Sepah’s chairman terminated Raji’s employment. Soon thereafter, Raji and his wife commenced this litigation. The Rajis claim damages for, inter alia, breach of contract and defamation; the Bank has counterclaimed for, inter alia, conversion.
I
Under our Federal system, the power to determine foreign policy and the Nation’s relationship with other sovereign Nations is exclusively exercised by the Federal Government. (US Const, art I, §§ 8, 10.) In contrast, while the Federal Government has ultimate power to regulate foreign and interstate commerce, each State ordinarily has the power to regulate commercial activity within its own borders unless the State regulation unreasonably burdens foreign or domestic commerce or otherwise conflicts with Federal authority. (US Const 10th Amend.) Private commercial activity conducted in this State either by a foreign sovereign Nation State or by an entity which it controls, cannot be easily categorized as exclusively a matter of only Federal or only State concern. When such activity spawns litigation, even good-faith, even-handed efforts to fairly execute the ordinary civil processes of American courts can cause friction with foreign Nations. Realizing the likelihood that such friction would be increased by conflicting State and Federal decisions, and attempting to establish a coherent, uniform national policy, Congress enacted the Foreign Sovereign Immunities Act. (See, House Report No. 94-1487, 1976 US Code Cong & Admin News, at 6606.) The FSIA constitutes a comprehensive statutory scheme regulating a matter of legitimate national concern. Accordingly, State courts are bound by the FSIA and its procedural limitations, and must apply Federal case law when interpreting the statute. Moreover, State courts should be sensitive to their responsibilities under the Federal system and must accordingly avoid constructions of the Federal statute that would disrupt the comprehensive national policy.
*160 II
The doctrine of foreign sovereign immunity evolved historically as a reciprocal courtesy between sovereigns. Like the related doctrine of diplomatic immunity applicable to individuals, it is an extension of the immunity from local law customarily accorded by a host monarch to a foreign sovereign or his representatives traveling through the host’s domain. A correlate to the doctrine of comity among Nations, it is a privilege, not a right. (See, New England Merchants Natl. Bank v Iran Power Generation & Transmission Co., 502 F Supp 120 [US Dist Ct, SDNY 1980].)
The modern doctrine of foreign sovereign immunity generally exempts foreign governments and their instrumentalities, physically or constructively present in a host country, from the jurisdiction of the host’s courts. Originally, the United States applied the doctrine so as to shield all activities of the foreign sovereign in the United States irrespective of their nature or purpose. In contrast, the restrictive theory of sovereign immunity, which had gained precedence in American and international law, applies the doctrine so as to shield only the sovereign acts of the foreign government. (See, Note, 65 Colum L Rev 1086.) In 1952, in the so-called "Tate Letter” issued by the State Department, the United States adopted the restrictive theory. (26 Department of State Bulletin, at 984-985.) Henceforth, there could be no doubt that a foreign sovereign or its instrumentality could no longer claim an exemption from American law, for all its activities in the United States, whether of a sovereign or a proprietary nature. Whether or not immunity was to be accorded thus required case-by-case determination. Since such determination was viewed essentially as a political question, properly within the discretion of the Federal executive branch, American courts routinely deferred to the State Department. (See, New England Merchants Natl. Bank v Iran Power Generation & Transmission Co., 502 F Supp, at p 124.)
In 1976, the restrictive theory of foreign sovereign immunity was codified in the FSIA. (28 USC § 1602 et seq.) The FSIA provides uniform guidelines for granting sovereign immunity to foreign States and makes the question a judicial one rather than an executive one. It includes what amounts to a long-arm statute clarifying when Federal and State courts can exercise in personam jurisdiction over foreign sovereign entities and authorized remedies for plaintiffs and judgment *161 creditors if a foreign State frustrates the judicial process or fails to satisfy a judgment within a reasonable time. (1976 US Code Cong & Admin News, at 6604, 6610.) As a whole, the act attempts to balance the competing interests of American plaintiffs seeking to redress legitimate claims arising from commerce with foreign governments with those of defendant foreign States seeking to prevent harassment of diplomatic personnel and encumbrance of assets, which could deleteriously affect legitimate diplomatic activity.
It cannot be disputed that the act is applicable to the case at bar. It is not disputed that the Bank and its New York agency are instrumentalities of Iran, and that the assets sought to be restrained were used for commercial activity. Bank Sepah is not immune from the jurisdiction of this court because it has failed to affirmatively assert entitlement to immunity as a foreign sovereign as a jurisdictional defense in its answer to the complaint. (FSIA §§ 1603, 1604.) Such a failure is to be deemed a constructive waiver of sovereign immunity from jurisdiction. (1976 US Code Cong & Admin News, at 6617.) Notwithstanding the existence of jurisdiction, FSIA § 1610 (d) limits the power of this court to grant provisional remedies. This section states:
"The property of a foreign state, as defined in section 1603 (a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment in any action brought in a court of the United States or of a State, or prior to the elapse of the period of time provided in subsection (c) of this section, if—
"(1) the foreign state has explicitly waived its immunity from attachment prior to judgment, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, and
"(2) the purpose of the attachment is to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction.” (28 USC § 1610 [d]; emphasis added.)
Prior to the enactment of the FSIA the property of a foreign sovereign was subject to attachment by American plaintiffs, both as a jurisdiction acquiring mechanism at the commencement of an action and as a pre or postjudgment security device. By providing that certain types of activity by a foreign sovereign suffice as a basis for in personam jurisdiction, the *162 FSIA obviated the need for most jurisdictional attachments,[1] which are no longer permissible. (FSIA § 1610 [d] [2].) The act logically differentiates between pre and postjudgment security attachments. Postjudgment attachments are permitted in aid of execution against several broad categories of American situated property used for commercial purposes. (FSIA § 1610 [a].) Prejudgment attachments, however, inherently burdensome because they encumber property before a final adjudication of the action on the merits, are permitted only in situations where the foreign sovereign has already explicitly waived its immunity. (FSIA § 1610 [d] [1].)
"Attachment” in the context of the FSIA has a broader meaning than in the traditional civil procedure sense. (Cf. CPLR 6201 et seq.; Fed Rules Civ Pro, rule 64.) The congressional intent was to encompass all encumbrances and restraints imposed to prevent the dissipation of assets before judgment. (See, 1976 US Code Cong & Admin News, at 6629.) Thus, it has been held that the attempted use of an injunction instead of an attachment violates the clear intent of the FSIA. (S & S Mach. Co. v Masinexportimport, 706 F2d 411.) A fortiori, the word "attachment” must be held to include all provisional remedies available under State law.
The stay sought here against the removal or dissipation of the bank’s assets therefore constitutes an attachment under the act. Such a restraint is permissible only if the Bank or Iran had previously given an explicit waiver of immunity from prejudgment attachment. (FSIA § 1610 [d] [1].) While such an explicit waiver need not specifically recite the words "prejudgment attachment”, the wording used must clearly, unambiguously and unequivocally evidence such intent. (Libra Bank v Banco Nacional, 676 F2d 47 [2d Cir 1982].) Evidence of such intent must be unequivocal because the FSIA creates strong presumption against prejudgment attachments. (Security Pac. Natl. Bank v Government & State of Iran, 513 F Supp 864 [US Dist Ct, CD Cal 1981].)
Plaintiffs have failed to present any evidence of a waiver by *163 Bank Sepah. While authorization to transact business in New York (Banking Law § 200) constitutes a basis for the exercise of in personam jurisdiction over a foreign sovereign owned bank (FSIA § 1603; CPLR 301, 302), it cannot be deemed an explicit waiver of immunity from provisional remedies. The Banking Law neither so provides nor mandates the execution of such a waiver as a condition precedent to a grant of authorization.
Participation in this litigation, including the prosecution, as plaintiffs, of a related action against the Rajis, has operated as a consent to in personam jurisdiction; it cannot be deemed an explicit waiver of immunity from prejudgment provisional remedies. While the Bank’s failure to timely raise an objection to in personam jurisdiction, either in the answer or by preanswer motion to dismiss, waives the objection (FSIA §§ 1603, 1605; CPLR 320 [b]; 3211 [e]); that principle is unavailing to plaintiffs. First, in personam jurisdiction is not at issue here; it is assumed by all parties and sanctioned by the Federal act. (FSIA §§ 1603, 1605.) Second, to hold that a defense based on the FSIA was so waived would be contrary to both the letter and spirit of the Federal law. While the act expressly provides for constructive waiver of objection to jurisdiction, it expressly provides otherwise regarding provisional remedies. (Cf. FSIA §§ 1603, 1605, 1610.) The act mandates an explicit waiver of immunity from provisional remedies in order to prevent inadvertent waivers and the uncertainty that could result from the application of differing State procedural requirements. Third, the objection lodged here, i.e., that because of controlling Federal law, this State court lacks the power to grant the type of relief sought, is in the nature of an objection to subject matter jurisdiction which is ordinarily not waivable. (Cf. Aboujdid v Singapore Airlines, 108 AD2d 330 [holding that failure to timely raise sovereign immunity defense operated as an implied waiver of immunity from suit].)
Neither is there any evidence of an explicit waiver by Iran. The Treaty of Amity concluded in 1958 between the United States and the previous government of Iran includes a broad waiver clause but is silent regarding provisional remedies. The relevant portion of the treaty reads as follows: "No enterprise of either [the United States or Iran] shall, if it engages in commercial, industrial, shipping or other business activities within the territories of the other High Contracting Party, claim or enjoy either for itself or for its property, immunity therein from taxation, suit, execution of judgment or other *164 liability to which privately owned and controlled enterprises are subject therein.” (Treaty of Amity, United States-Iran, Aug. 15, 1955, art XI, para 4, 8 US Treaties, at 899, 909; TIAS No. 3853; emphasis added.)
Does the term "other liability” embrace prejudgment attachments as broadly defined by the FSIA? This language is vague and thus susceptible to different constructions. (See, e.g., Burrows & Newman, Prejudgment Attachments-Treaty Waivers of Immunity, NYLJ, May 19, 1983, p 1, col 1.) Both logic and an analysis of the wording itself compel the conclusion that the treaty clause lacks the clarity and specificity required if it were to be deemed an explicit waiver. That the treaty predated the statute is immaterial. It would undermine the clear congressional intent and twist the plain meaning of the word "explicit” to permit each Federal and State court, on an ad hoc basis, to attempt to divine an explicit waiver from inexplicit language. Moreover, the weight of Federal authority holds that the treaty clause is not to be deemed an explicit waiver of immunity from provisional remedies. (Security Pac. Natl. Bank v Government & State of Iran, 513 F Supp 864, 879-880, supra; New England Merchants Natl. Bank v Iran Power Generation & Transmission Co., 502 F Supp 120, 126-127, remanded 646 F2d 779, supra; E-Systems, Inc. v Islamic Republic of Iran, 491 F Supp 1294, 1301, 1302 [US Dist Ct, ND Tex 1980]; Reading & Bates Corp. v National Iranian Oil Co., 478 F Supp 724, 728 [US Dist Ct, SONY 1979]; Behring Inti. v Imperial Iranian Air Force, 475 F Supp 383, 392-393 [US Dist Ct, DNJ 1979]; see also, in accord, Libra Bank v Banco Nacional, supra; but see, contra, Electronic Data Sys. Corp. Iran v Social Sec. Org. of Govt. of Iran, No. 79 Civ 1711 [US Dist Ct, SONY 1979], remanded 610 F2d 94 [2d Cir 1979].)
In the absence of an explicit waiver of immunity by either Bank Sepah or Iran, the relief sought is not permissible under the controlling Federal law.[2] Accordingly, the supremacy *165 clause bars resort to State law as authority for the relief sought. (US Const, art VI, cl 2.)
III
Plaintiffs, assuming such waiver, claim entitlement to the requested stay under several provisions of New York State law. Even assuming, arguendo, that Federal law would not bar the relief sought, the provisions cited by plaintiffs would be unavailing in the situation presented.
Banking Law § 606 (4) (a) empowers the superintendent of banks to seize the assets of an authorized foreign banking corporation upon liquidation of its New York agency. Such seizure is within the discretion of the superintendent and is intended to protect the bank’s depositors and creditors. This provision neither mandates action by the superintendent nor creates an additional right that can be enforced by private litigants. It does not itself empower this court to independently order the seizure or encumbrance of the Bank’s assets.[3]
CPLR 6201 sets forth the circumstances where an attachment can be sought. Subdivision (3), cited by plaintiffs, allows an attachment where intent to defraud or frustrate the enforcement of a judgment is demonstrated. Plaintiffs seem to imply that the very act of filing for liquidation is proof of intent to defraud. Such intent, however, may not be lightly presumed. It requires plaintiffs to come forward with specific factual allegations supported by competent evidence. Plaintiffs’ moving papers contain no evidence of intent to defraud; *166 they have thus not met their burden of going forward under this provision.
Business Corporation Law § 1115 (a) (2) grants the court discretion to grant an injunction in an action or special proceeding under the Business Corporation Law. It would therefore apply to liquidation proceedings of a New York corporation governed by that statute. It is inapplicable to liquidation proceedings regarding the New York agency of a foreign banking corporation governed by the Banking Law. By it own terms, the cited provision is wholly inapposite to the instant action sounding in contract and tort. Moreover, this section does not alter the familiar requisites for the granting of injunctive relief. (See, Grant Co. v Srogi, 52 NY2d 496; Albini v Solork Assoc., 37 AD2d 835.)
In conclusion, plaintiffs have not met their burden of proving entitlement to the relief sought. The motion is accordingly denied.

. The following year, the United States Supreme Court held that quasi in rem jurisdiction acquiring attachments violated due process if the defendant lacked minimum contacts with the forum State. (Shaffer v Heitner, 433 US 186 [applying the standard of International Shoe Co. v Washington, 326 US 310].) Such attachments of property unrelated to the plaintiffs cause of action quite understandably were regarded as among the most vexatious by foreign sovereign entities in this country. (See, 1976 US Code Cong & Admin News, at 6606.)

. The court is well aware that such a requirement is seldom capable of being met. Indeed, it may often be unfairly burdensome to American litigants. The law grants a great advantage to foreign governments and foreign government owned businesses not enjoyed by Americans, privately owned foreign businesses or individual foreign nationals transacting business in the United States. A foreign sovereign, often for commercial gain, may resort to American courts and their processes, and may obtain the benefit of provisional remedies. Yet, when faced with litigation arising from their American commercial activity, the same foreign sovereign entities may, with impunity, remove assets from the jurisdiction, rendering any *165 ultimate judgment unenforceable. Nevertheless, Congress has determined that any such possible unfairness is outweighed by more compelling national and foreign policy considerations. Congress had the power to make that determination; State courts have the duty to respect it.
In the absence of any change in Federal law, several remedies are available. First, anyone considering whether to transact business with a foreign sovereign owned entity should be on notice that he would do so at some risk. Thus, he may choose not to deal with the foreign sovereign. One dealing with a foreign sovereign may seek protection, or additional consideration, by contract, e.g., adjustment of price, financing or payment terms; posting of a bond or transfer of collateral. Finally, to the extent permitted by Federal law, protection may be afforded by State legislation. For example, Banking Law § 200 could be amended to mandate that foreign sovereign owned banks execute explicit waivers of immunity from prejudgment provisional remedies, as a condition precedent to obtaining State authorization to transact business in New York.

. Indeed, it does not appear that the superintendent has even been requested to make such a seizure.