OPINION OF THE COURT
Kristin Booth Glen, J.
This case presents an issue of first impression whose resolution requires consideration of both the Foreign Sovereign Immunities Act (28 USC § 1602 et seq.) (the FSIA) and New York statutory scheme concerning prejudgment attachments (CPLR 6201 et seq.). The question, put most simply, is whether the postattachment nationalization of a defendant and its property requires, as a matter of statutorily created sovereign immunity, the denial of the plaintiff’s motion for an increased attachment and/or the vacating of the prior attachment. For the reasons discussed below the motion is denied and the prior attachment vacated.
FACTS
The underlying action involves a contract for the sale of various petroleum products by defendant Trinidad & Tobago Oil Co., Ltd. (Trintoc) to plaintiff Interpetrol Bermuda Ltd. (Interpetrol). An action was commenced on December 1, 1977 by order to show cause with a TRO against the transfer of assets by plaintiff and two garnishees.[1] A subsequent order to show cause brought on an attachment proceeding, and on May 19, 1978 an order confirming the attachment was entered.[2] At that time, it was conceded that defendant, incorporated under the laws of the United Kingdom, was "a foreign corporation not qualified to do business in the state”, one of the four grounds for attachment set forth in CPLR 6201.
Subsequent to the order, the parties entered into various negotiations concerning alternatives to the attachment, not relevant here, but including an offer by defendant to establish a letter of credit to be drawn on by plaintiff in the event it *162 ultimately prevailed in the lawsuit.[3] The offer was rejected, and the attachment, in the amount of $471,640.18, continued.
After some activity, in around 1981, plaintiff ceased to prosecute the action. No discovery was conducted, no depositions taken and no communications were had with defendant for a period of five years. On January 10, 1986 defendant filed a demand, pursuant to CPLR 3216, for Interpetrol to resume prosecution or have its case dismissed. Plaintiff, with new counsel, filed a note of issue and on September 23, 1986 moved for an order of additional attachment in the amount of $357,849.92, representing interest on the judgment sought. Defendant opposed and cross-moved to vacate the 1978 order of attachment on the grounds, inter alla, that in December 1980, the government of Trinidad and Tobago had, by legislative act[4] (Vesting Act), transferred the assets of defendant Trintoc-U.K. to a new corporation Trinidad and Tobago Oil Co. Ltd., Trinidad and Tobago (Trintoc-Trinidad) organized under its domestic laws. The new corporation, like the old, was wholly owned by the Republic of Trinidad and Tobago. As such, defendant argued its property was immune from prejudgment attachment under the FSIA, most particularly section 1609. Additionally, defendant argued that under New York law, the attachment must be vacated since Interpetrol has failed to show need for its continuation and because it is unduly burdensome. These grounds will be considered seriatim.
IMMUNITY UNDER THE FSIA
The FSIA, passed by Congress in 1976, provides a comprehensive and uniform statutory scheme defining and preserving sovereign immunity in the courts — State and Federal — of the United States. In addition to its jurisdictional provisions, the act provides as follows: "Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of *163 a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611[5] of this chapter.” (28 USC § 1609.)
Under section 1603 of the act, a "foreign state” includes an organ of a foreign sovereign which is wholly owned by the foreign sovereign (e.g., S&S Mach. Co. v Masinexportimport, 706 F2d 411 [2d Cir], cert denied 464 US 850 [1983] [trading company wholly owned by government of Romania]; Carey v National Oil Corp., 592 F2d 673 [2d Cir 1979] [State-owned oil company]). Since the Vesting Act, it cannot be denied and is not disputed that Trintoc-Trinidad is a foreign State within the meaning of the FSIA. As such, its property is absolutely immune from prejudgment attachment except where there has been an explicit waiver of immunity by the foreign sovereign,[5]
[6] as provided in section 1610 (d) (e.g., Schwartz v Merchants Bank, 109 AD2d 108 [1st Dept 1985]; see also, O’Connell Mach. Co. v M.V. "Americana”, 734 F2d 115, 117 [2d Cir 1984]; S&S Mach. Co. v Masinexportimport, supra, at 416).
WAIVER
A. JUDICIAL INTERPRETATION
The requirement of explicit waiver under the Immunities Act was designed by Congress to avoid inadvertent or implied waivers. (Schwartz v Merchants Bank, 109 AD2d, at 111, supra; Libra Bank v Banco Nacional de Costa Rica, 676 F2d 47, 49 [2d Cir 1982].) Congress recognized that prejudgment attachment is "an extraordinary and harsh remedy not to be lightly waived.” (New England Merchants Natl. Bank v Iran Power Generation & Transmission Co., 502 F Supp 120, 126 [US Dist Ct, SD NY 1980].) As the Second Circuit has explained: "the asserted waiver must demonstrate unambiguously the foreign state’s intention to waive its immunity from prejudgment attachment in this country. We do not take lightly the congressional demand for explicitness. It would be *164 improper for a court to subvert this directive by substituting a judicially reconstituted gloss or a facially unclear document for an unequivocal waiver by the foreign state.” (S&S Mach. Co. v Masinexportimport, 706 F2d, at 416, supra).
The question thus becomes whether under this rigorous standard the government of Trinidad-Tobago has "explicitly” waived its immunity from prejudgment attachment by the language of the Vesting Act.
That act has two relevant provisions. Section 4 (1) (h) provides: "(h) any security provided by or for the Company that immediately before the appointed day was held as security for the payment or discharge by the Company of a debt or liability or obligation (whether present or future, actual or contingent) shall be held by and be available to a holder as security for the payment or discharge by Trintoc of that debt or liability or obligation; and any such security which extends to future advances or liabilities shall on and from the appointed day, be held by and be available to the holder as security for future advances to, and future liabilities of, Trintoc in the same manner in all respects as future advances to or liabilities of the company were secured thereby immediately before the appointed day”.
Under the Vesting Act, provision was also made that judgments or awards against Trintoc-U.K. would be enforceable against Trintoc-Trinidad. Section 4 (1) (i) of the Vesting Act provides: "(i) any judgment or award obtained by or against the company and not fully satisfied shall be enforceable by or against Trintoc”.
By these provisions plaintiff argues that the Republic of Trinidad and Tobago has "explicitly waived” its immunity with regard to prejudgment attachment in this litigation.
Since the enactment of the FSIA, a number of cases have considered whether language in varying documents and in treaties reaches the high, congressionally mandated standard of "explicit” waiver. The leading group involved interpretation of the U.S.-Iran Treaty of Amity, which contained the following language: "No enterprise of either High Contracting Party, including corporations, associations, and government agencies and instrumentalities, which is publicly owned or controlled shall, if it engages in commercial, industrial, shipping or other business activities within the territories of the other High Contracting Party, claim or enjoy, either for itself or for its property, immunity therein from taxation, suit, *165 execution of judgment or other liability to which privately owned and controlled enterprises are subject therein.” (Treaty of Amity, art XI, para 4, 8 UST 899, 909 [1957]; emphasis added.)
Almost uniformly the Federal and State courts confronted with this language held it was not an explicit waiver of prejudgment immunity as required by section 1610 (d) (e.g., New England Merchants Natl. Bank v Iran Power Generation & Transmission Co., 502 F Supp 120, 125-126 [US Dist Ct, SD NY 1980], supra; American Intl. Group v Islamic Republic of Iran, 493 F Supp 522 [US Dist Ct, DC 1980]; E-Systems, Inc. v Islamic Republic of Iran, 491 F Supp 1294 [US Dist Ct, ND Tex 1980]; Behring Intl. v Imperial Iranian Air Force, 475 F Supp 383 [US Dist Ct, D NJ 1979]; Raji v Bank Sepha-Iran, 131 Misc 2d 158, 164; see also, Pre-Judgment Attachments of Iranian Assets in the United States: Waiving Sovereign Immunity, 13 NY U J of Intl L & Politics 675, 684, 701; Prejudgment Attachment of Frozen Iranian Attachments, 69 Calif L Rev 837, 841, n 28, 846).
In considering similar language in a U.S.-Romanian trade agreement waiving immunity "from suit an execution of judgment or other liability” (Agreement on Trade Relations Between United States and Romanian Government, Apr. 2, 1975, art IV, para 2, 26 UST 2305, 2308-2309, TIAS No. 8159), the Second Circuit has held that "the 'other liability’ language does not unequivocally express the will of the parties to waive immunity from prejudgment attachment” (S&S Mach. Co. v Masinexportimport, supra, at 417).
In the only case where explicit waiver was found, a borrower and lender expressly agreed in writing that the borrower was subject to suit and " '[did] not have any right of immunity’ ” (supra, 676 F2d, at 49; emphasis added). In addition, the borrower executed four promissory notes stating that he " 'irrevocably and unconditionally waives any right or immunity from legal proceedings’ ” (supra, at 49). Based on this unconditional language, speaking directly to the question of immunity, the Second Circuit found an explicit waiver. (Libra Bank v Banco Nacional de Costa Rica, supra, 676 F2d, at 49-50.)
On their face, the provisions of the Vesting Act relied upon by plaintiff do not rise to the stringent standard of explicitness required by the FSIA. Section 4 (1) (h) and (i) does not clearly and unambiguously evince an intent on the part of *166 Trintoc-Trinidad or the Republic of Trinidad and Tobago to waive any right of immunity from prejudgment attachment. Indeed, unlike the language in Libra Bank (supra), and even unlike that in S&S Mach. (supra), the Vesting Act contains no reference to immunity at all.
B. THE VESTING ACT AND TRINIDADIAN LAW
Consideration of the context of the Vesting Act and of Trinidadian law compels the same conclusion. In an unrebutted affidavit by a member of the Trinidad Bar, defendant explains that the purpose of the Vesting Act was to enable Trintoc-Trinidad to acquire certain assets, liabilities and obligations of Trintoc-U.K. Significantly, at the time of the adoption of the Vesting Act, there was no procedure under the laws of Trinidad and Tobago for prejudgment attachment.
Thus, it is clear that the legislature of Trinidad and Tobago did not intend to waive — and could not have waived — its immunity from prejudgment attachment. (See, Reading & Bates Corp. v National Iranian Oil Corp., 478 F Supp 724, 729 [US Dist Ct, SD NY 1979] [rules of construction dictate that in interpreting an alleged waiver of immunity from prejudgment attachment the "paramount consideration for a Court * * * is to give effect to the intent of the parties”].)
If the Trinidad and Tobago legislature intended to explicitly waive Trintoc-Trinidad’s immunity from prejudgment attachment, it would have done so in section 4 (1) (i) of the Vesting Act, the only provision which directly refers to litigation. Under section 4 (1) (i), "any judgment or award obtained by or against the company and not fully satisfied shall be enforceable by or against Trintoc.” The omission in this paragraph of any mention of waiver of immunity clearly demonstrates that no waiver of immunity was intended.
Finally, defendant has submitted the affidavit of Seunarine Jokhoo, Acting Permanent Secretary in the Ministry of State Enterprises of the Republic of Trinidad-Tobago,[7] who states that: "attachment of the assets of Trintoc-Trinidad is inconsistent with principles of international comity * * * and is against the interest of the Republic of Trinidad and Tobago.” While this affidavit, originally submitted as proof of TrintocTrinidad’s status as a "foreign state” does not speak directly to the issue of immunity, it is additional evidence that no waiver was ever intended by enactment of the Vesting Act.
*167 C. RETROACTIVITY
Plaintiffs final argument against the applicability of FSIA immunity is that Trintoc-Trinidad, having acquired the assets, liabilities and obligations of Trintoc-U.K. is not retroactively entitled to the benefits conferred by the FSIA. In support of this position it cites Amoco Overseas Oil Co. v Compagnie Nationale Algerienne de Nav. (605 F2d 648, 654 [2d Cir 1979]) and Ipitrade Intl. v Federal Republic of Nigeria (465 F Supp 824 [US Dist, DC 1978]). The citations to these cases are, however, inapposite.
Amoco (supra) involved the retroactive application of the FSIA to an attachment perfected prior to passage of the act.[8] The Second Circuit construed the statutory language of section 1609 to "make[s] the property of a foreign state immune from attachment [only] after the effective date of the Act” (supra, at 653). The decision, in fact, implies that after the act’s passage, all property of foreign States, however and whenever acquired, is subject to immunity unless otherwise waived in accordance with the act. Here, of course, both the attachment and the "nationalization” took place after 1976. Ipitrade (supra) is even less helpful to plaintiff as it concerned a foreign sovereign’s implicit waiver of its immunity pursuant to an arbitration agreement and did not involve prejudgment attachment.
Accordingly, as there is no explicit waiver and as there is no bar to the applicability of postattachment assertion of sovereign immunity, the FSIA governs and the prior attachment is vacated.
STATE LAW
Even if the FSIA were inapplicable to the existing attachment,[9] New York law requires that it be vacated. Our courts have repeatedly emphasized that attachment is a "harsh” and *168 "extraordinary” remedy which must be construed "strictly in favor of those against whom it may be employed.” (Penoyar v Kelsey, 150 NY 77, 87 [1896]; Provisional Protective Comm. v Williams, 121 AD2d 271 [1st Dept 1986]; P. T. Wanderer Assocs. v Talcott Communications Corp., 111 AD2d 55, 56 [1st Dept 1985]; First Natl. Bank v Highland Hardwoods, 98 AD2d 924, 926 [3d Dept 1983].)
Thus, attachment should not be lightly granted as it "runs counter to the fundamental common-law concept that before depriving a party of his property, opportunity for hearing should be offered” (Reich v Spiegel, 208 Misc 225, 230 [Sup Ct, NY County 1955]; Merrill Lynch Futures v Kelly, 585 F Supp 1245, 1249 [SD NY 1984]).
Under CPLR 6223, a court may vacate an attachment on the ground that the attachment has been improperly issued. (Manufacturers & Traders Trust Co. v Lowenstein, 91 AD2d 848 [4th Dept 1982]; Henry Stuart [Fabrics] v Moskowitz & Co., 44 AD2d 798 [1st Dept 1974].) When an attachment is challenged, the plaintiff has the burden of proving the propriety of the attachment on three separate issues. The statute provides as follows: "Burden of Proof. Upon a motion to vacate or modify an order of attachment the plaintiff shall have the burden of establishing the grounds for the attachment, the need for continuing the levy and the probability that he will succeed on the merits.” (CPLR 6223 [b]; see, e.g., Ford Motor Credit Co. v Hickey Ford Sales, 62 NY2d 291 [1984]; Laco X-Ray Sys. v Fingerhut, 88 AD2d 425, 429 [2d Dept 1982].) A court is given "broad discretion” to vacate an attachment order where the evidence appears insufficient to justify the attachment order. (AMF Inc. v Algo Distribs., 48 AD2d 352, 361 [2d Dept 1975], citing Zenith Bathing Pavilion v Fair Oaks S. S. Corp., 240 NY 307, 313 [1925].)
In the instant case the plaintiff has met its burden as to the first and third[10] requirements, but has failed to demonstrate "the need for continuing the levy”. Defendant has shown, by affidavit, that Trintoc-Trinidad is an ongoing business entity, capable of satisfying any judgment which may be entered against it. Plaintiff has neither rebutted this assertion or provided any evidence whatsoever that defendant is removing or secreting assets to frustrate a potential judgment. (P. T. Wanderer Assocs. v Talcott Communications Corp., supra.)
*169 In addition to the plaintiffs failure of proof as to need, defendant has, also by unrebutted affidavit, demonstrated hardship as a result of the attachment.[11] This provides another reason for vacating the attachment (see, e.g., Trigo Hnos, Inc. v Premium Wholesale Groceries, 424 F Supp 1125, 1133 [US Dist Ct, SD NY 1976]; 7A Weinstein-Korn-Miller, NY Civ Prac ¶ 6223.09 ["Vacatur should be granted particularly in those cases where maintaining the attachment will cause severe hardship to the defendant”]).
Finally, Weinstein-Korn-Miller suggests that since attachment is a remedy which is always subject to the court’s discretion, an attachment may be vacated on any ground, and vacatur is not limited to the grounds specifically enumerated in the statute (ibid.). Given the equities in the case, including plaintiff’s failure to prosecute this action for five years, and the respect which should be shown a friendly foreign sovereign, irrespective of the strict applicability of the FSIA, the attachment is vacated as a matter of judicial discretion.

. As a result of the TRO, Tesoro Petroleum Corp. withheld more than $300,000 in accounts receivable, and Citibank withheld some $300,000 in defendant’s checking account.

. The order included the requirement that a $50,000 bond be posted by plaintiff and provided that in the event that it was determined that Interpetrol was ultimately not entitled to the attachment, Interpetrol "shall pay to [Trintoc-U.K.] all costs and damages, including reasonable attorney’s fees, which may be sustained by reason of the restraint”.

. Defendant argued that this would be less costly to it, allowing the use of the frozen funds, inter alla, to earn interest, and to the plaintiff who would be spared the expense of a bond. It is not clear why this offer was rejected.

. This was the Trinidad and Tobago Oil Company Limited Vesting Act (the Vesting Act) enacted by the Fifth Session, First Parliament of the Republic of Trinidad and Tobago, passed by both houses and asserted to in December 1980. Following the acquisition of Trintoc-U.K.’s assets by Trintoc-Trinidad, the original U.K. Corp. was voluntarily wound up.

. Section 1611 involves special immunities accorded central bank and military property and is inapplicable to this case.

. Another section, 28 USC § 1610 (a)-(c), permits both explicit and implicit waivers in the case of postjudgment attachments. The distinction and higher burden of waiver for prejudgment attachment reflects the "inherently burdensome” nature of those attachments since they "encumber property before a final adjudication of the action on the merits” (Raji v Bank Sepha-Iran, 131 Misc 2d 158, 162 [Sup Ct, NY County 1985].) It is, of course, the "explicit waiver” standard of section 1610 (d) which governs here.

. This is the ministry responsible for the functioning of all State enterprises including Trintoc-Trinidad.

. Significantly, the attachment in Amoco constituted the basis of jurisdiction in that quasi-in rem action. To retroactively void the attachment would thus have drastically affected the substantive rights of the parties, a result not permissible under the most persuasive construction of the act. (Jackson v People’s Republic of China, 794 F2d 1490, 1497-1498 [11th Cir 1986].) In the instant case, which does not actually involve retroactivity of the statute, the substantive rights of the parties remain unchanged notwithstanding a voiding of the attachment.

. There can be no question that an increased attachment would be subject to the FSIA since it would clearly constitute the taking of property owned by Trinidad and Tobago.

. I make no independent determination as to the merits and probable success since this was previously decided by Justice Asch and, as such, is law of the case.

. According to the affidavit of Hugh Howard, Trintoc-Trinidad has suffered significant financial losses as a result of the attachment. These include loss of the benefit of a lower interest rate on money borrowed under the Citibank line of credit, and a least $161,500, representing the interest which Trintoc-Trinidad would have earned on the checking surplus.